# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### 1:05CV29-W

| | | |
|---|---|---|
| **PHILLIP ANTWAN DAVIS,** | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **ORDER** |
| | ) | |
| **MARVIN POLK, Warden,** | ) | |
| **Central Prison** | ) | |
| **Raleigh, North Carolina** | ) | |
| **Respondent.** | ) | |
| | ) | |

This matter is before the Court upon Phillip Antwan Davis's Petition for Writ of Habeas Corpus (sometimes hereinafter "Petition") filed pursuant to 28 U.S.C. § 2254 on February 9, 2005. Also before the Court are the State's[1] Motion to Dismiss and Motion for Summary Judgment, as well as Petitioner's Cross-Motion for Summary Judgment.

## FACTS

On August 4, 1997, Davis pled guilty to the first-degree murders of his aunt, Joyce Miller, and cousin, Caroline Miller. Following entry and acceptance of the guilty plea, a capital sentencing proceeding was conducted at the 4 August 1997 Criminal Session of Superior Court, Buncombe County, the Honorable Ronald K. Payne, Judge Presiding. Davis was represented by Faye Burner and William Leslie, both Buncombe County Assistant Public Defenders.

The facts of this case are summarized in the North Carolina Supreme Court's opinion on Davis's direct appeal:

> Defendant, who was eighteen years old, was living in the home of his aunt,

---

[1]For ease of reference, the Court will refer to Respondent as "the State" throughout this Order.

Joyce Miller (Miller), in Asheville, North Carolina.  Also residing in Miller's home were Miller's seventeen-year-old daughter, Caroline Miller (Caroline), and two young foster children.

Approximately one week before the murders, Miller told her brother, Billy Davis that she was missing $800.00.  Caroline believed that defendant had taken the money because he had recently purchased clothing and a gold chain.  Miller obtained a receipt for the clothes and returned them.  Caroline was hiding the gold chain from defendant so that she and Miller could take it to a pawn shop.  Several days before the murders, defendant stated to Caroline, "Well, if I don't get my chain, it's only going to hurt you in the long run."

On 24 May 1996, defendant shot and killed his cousin Caroline.  On the same day, he killed Miller by shooting her and cutting her with a meat cleaver.  Davis visited Miller's home in the evening and found Miller lying in a pool of blood.  Niconda Briscoe, defendant's girlfriend, arrived at approximately the same time as Davis and called for emergency assistance.

A paramedic with the Buncombe County Emergency Medical Service arrived at the Miller residence at 7:32 p.m.  He noted blood smeared on the outside of the door.  He discovered severed fingers on the floor in the foyer and Miller's body in a large pool of blood.  The two foster children were in the living room looking into the foyer.  As the paramedic entered the living room to escort the children out, he observed Caroline in her bedroom on the bed.  After checking her pulse, he determined that she, too, was dead.

Meanwhile, between 7:30 and 8:00 p.m., defendant attempted to cash a check in the amount of $360.00, bearing the name of Miller's former husband, at the Bi Lo grocery store on Hendersonville Road.  The manager refused to cash it, as she did not believe it was legitimate.  According to the manager, defendant appeared to be "really calm."

At approximately 8:00 p.m., defendant went to Dillard's in the Asheville Mall and tried on clothing in the men's department.  The sales receipt showed that defendant purchased six clothing items at 8:08 p.m. for $231.61 using a credit card in Miller's name.  When questioned by the cashier, defendant told her that the credit card belonged to his aunt and that she knew he was using it.  Two of the items defendant purchased were identical to the ones Miller had returned several days prior to the murders.

At 8:21 p.m., a driver for the Blue Bird Cab Company was dispatched to the Amoco station on Hendersonville Highway.  A person matching defendant's description approached the driver and said, "It's me. I'll be with you in a couple minutes."  He returned with two bags and asked the driver to take him to Pisgah View Apartments.

Defendant entered unit 29-D of Pisgah View Apartments; showed an acquaintance, Felicia Swinton, the clothes he had purchased; changed clothes; and

left to attend a party in West Asheville. He spent approximately twenty minutes in Swinton's apartment and acted "normal."

Kendall Brown and Ryan Mills, friends of defendant's, heard that Miller and Caroline had been murdered and went to the party to pick up defendant. During the ride back to the Miller residence, defendant asked Brown if it "was . . . true about the murders" and said he "wanted to know what all had happened." When they arrived at the residence, defendant sat on the curb; started crying; and said, "Please don't let them take me."

Later that evening, Sergeant David Shroat took a statement from defendant at the Asheville Police Station. Defendant first told Sergeant Shroat that he did not know what had happened; then blamed others; and finally stated, "My life is over; I did it."

Defendant described the following series of events to the detectives. Earlier in the week, defendant found a gun in the closet and test-fired it in the back yard. At approximately 5:30 p.m. on 24 May 1996, he entered Caroline's bedroom with the gun in order to get his clothes. Caroline was lying on her bed. He went to the right side of the bed, pointed the gun at her, and fired twice. He then walked around to the other side of the bed and fired a third shot at her. After killing Caroline, defendant ate a sandwich and watched television. Miller arrived at the residence at approximately 7:00 p.m. with the two foster children. When defendant heard her entering, he hid behind the door. After she entered, defendant shot her in the back. He shot Miller only one time because he had "[n]o more bullets." Miller attempted to reach the telephone, but defendant pulled the cord from the receptacle. When she tried to leave the house, he took a meat cleaver from the kitchen and struck her with it ten or twelve times with his eyes closed as he stood on top of her in the foyer.

Immediately thereafter, defendant placed his clothes in a white plastic garbage bag along with the meat cleaver. He took two VCRs, one from Caroline's bedroom and one from Miller's, and put them in another plastic bag along with Miller's brown purse. He also took Miller's black purse. At approximately 7:15 p.m., he placed the two plastic bags on the front passenger floorboard of Miller's vehicle. Defendant then drove to the Asheville Mall, where he used Miller's credit cards to purchase clothing.

From the Asheville Mall, defendant drove to Oak Knoll Apartments and placed the two plastic bags in the Dumpster. He then drove to the Amoco station, where he threw the black purse and the gun into a wooded area behind the station. He told the taxi cab driver whom he had called that he would be there in a minute, returned to Miller's vehicle, and retrieved the shopping bags containing the clothing he had purchased at Dillard's.

Defendant left Miller's vehicle at the Amoco station and traveled in the taxi to Pisgah View Apartments, where he changed clothes. He then put the

stolen credit cards and keys to Miller's vehicle in a garbage can near Swinton's apartment.  Defendant drove around downtown Asheville with his friend Kelby Moore and smoked marijuana.

At 10:30 p.m., defendant arrived at the party in west Asheville.  Defendant danced for a while at the party before Brown and Mills took him to Miller's residence.  Upon completing his statement, defendant went to sleep under the table in the interview room.

The autopsy of Miller revealed that she had a single gunshot wound to the left side of the head, amputation of two fingers, and fifteen individual and clustered injuries consistent with being inflicted by a meat cleaver.  The autopsy of Caroline revealed three separate gunshot wounds, one to the head with stippling around the entrance wound indicating a close range shot; one to the chest; and one to the arm.

Investigators found that Caroline's bedroom was in disarray and that a VCR and television were missing.  A large amount of cash and some jewelry were discovered in a book bag in Caroline's room.  In Miller's bedroom, drawers had been pulled out and items had been dumped on the bed.  Investigators found an empty jewelry box, a checkbook, and a box of checks on the floor.  A second VCR was missing from the entertainment center in Miller's bedroom. Miller's truck, a red Bravada, was also missing.

Police officers recovered two VCRs, jewelry, clothes, a bloody meat cleaver, and a brown purse containing Miller's bank cards from a Dumpster at the Oak Knoll Apartments.  Additionally, they found Miller's credit cards in a trash bag near Pisgah View Apartments.  Miller's Bravada truck, two gloves, a black purse, and a Colt .32 revolver with five spent casings in the cylinder were discovered near the Amoco station.

*State v. Davis*, 539 S.E.2d 243, 251-53 (N.C. 2000).  Davis did not testify at the sentencing proceeding, but defense counsel called a number of witnesses to testify on his behalf.  Davis's evidence tended to show the following:

Defendant's mother was a drug addict, habitual felon, and mental patient who could not care for him, and his father took no responsibility for him.  Since his childhood, defendant alternated between the homes of friends and relatives because his mother was periodically incarcerated or incapacitated.  Defendant was a good athlete, but his parents never attended his athletic or school events.  When he was thirteen years old, defendant sustained a closed-head injury when he intervened in an argument between his mother and a drug addict, who hit defendant with a baseball bat.

In the summer of 1995, defendant moved in with Miller and Caroline and obtained a job at a Food Lion grocery store. He made the school football team and stopped working in September when football season began. Teammates described defendant as a leader and a hard worker. In December of 1995, defendant began working as a bag boy at a Bi Lo grocery store where he was described as a good worker. Defendant's high school principal described him as a normal and well-behaved student. Defendant was "on track" to graduate from high school, was accepted into North Carolina A & T State University, and had passed an Air Force entrance test.

There was constant rivalry between defendant and Caroline to the extent that Caroline packed up defendant's belongings on more than one occasion. There was also tension between defendant and his aunt. On one occasion, Miller pointed a pistol at defendant and said that when she gave him an order, "she expected it to be done." Witnesses described defendant as remorseful and noted that he cried whenever he discussed the murders.

A clinical psychologist, Dr. Jerry Noble, testified as an expert witness. Dr. Noble performed a postarrest evaluation and determined that defendant's basic psychological, emotional, and nurturing needs had been neglected. Defendant had an IQ of only 78, but he never repeated a grade or had any special-education classes. According to Dr. Noble, defendant had four significant mental disorders on 24 May 1996: (1) borderline intellectual functioning, (2) borderline personality disorder, (3) cannabis abuse, and (4) acute stress disorder. The borderline personality disorder caused defendant to be emotionally unstable and impulsive and to have difficulties in interpersonal relationships. Dr. Noble described defendant as anxious, depressed, immature, and prone to unravel during periods of stress. Defendant's conduct in eating a sandwich and watching television after he killed Caroline was consistent with acute stress disorder, disassociation, and derealization. According to Dr. Noble, defendant could not fully remember, did not understand, and was genuinely bewildered about Miller's death. Following the homicides, defendant exhibited suicidal thoughts, increased interest in religion, and signs of remorse. Dr. Noble opined that defendant was under the influence of a mental or emotional disturbance at the time of the murders and that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired.

*Id.* at 253.

On August 21, 1997, the jury recommended a sentence of death for the murder of Joyce Miller and a life sentence for the murder of Caroline Miller. In the Joyce Miller case, the jury found as aggravating circumstances that the murder was: (1) committed during the course of an

5

armed robbery; (2) committed for pecuniary gain; (3) especially heinous, atrocious, or cruel; and (4) part of a course of conduct, including the commission of other crimes of violence against another person. The jury also found fifteen of the fifty statutory and nonstatutory mitigating circumstances submitted to it. In accordance with the jury's recommendation, the trial judge imposed a sentence of death for the first-degree murder conviction of Joyce Miller and a sentence of life imprisonment without parole for the first-degree murder conviction of Caroline Miller.

## PROCEDURAL HISTORY

Davis filed a direct appeal to the North Carolina Supreme Court challenging his sentence of death for the Joyce Miller murder. The North Carolina Supreme Court affirmed his sentence on December 21, 2000. *See State v. Davis*, 539 S.E.2d 243 (N.C. 2000). The United States Supreme Court denied Davis's Petition for Writ of Certiorari on October 1, 2001. *See Davis v. North Carolina*, 534 U.S. 839, 122 S.Ct. 95 (2001).

On May 28, 2002, Davis filed a Motion for Appropriate Relief (hereinafter "MAR") in the Superior Court, Buncombe County. On August 29, 2002, the Honorable Dennis J. Winner, Jr., Chief Superior Court Judge, entered an order granting an evidentiary hearing on Claims III, IV and V and denying all other claims raised in the MAR.

On August 26, 2003, an evidentiary hearing was conducted before the Honorable James U. Downs. An Order denying Davis's remaining claims was filed on December 2, 2003. On October 6, 2004, the North Carolina Supreme Court denied Davis's Petition for Writ of Certiorari. *See State v. Davis*, 604 S.E.2d 919 (N.C. 2004).

On February 9, 2005, Davis filed the instant Petition for Writ of Habeas Corpus in which

he challenges his first-degree murder conviction and his death sentence for the murder of Joyce Miller. The State filed a Motion to Dismiss and a subsequent Motion for Summary Judgment. The State's Motion for Summary Judgment relied upon the previously filed Answer and its accompanying brief, as well as the state court records, for its arguments in favor of summary judgment. Petitioner filed a Cross-Motion for Summary Judgment.

DISCUSSION

LEGAL STANDARDS

A. *Standard of Review under The Antiterrorism and Effective Death Penalty Act of 1996*

For those of Davis's claims that were adjudicated on the merits by the North Carolina courts and that are not procedurally defaulted, this Court's review is limited by the deferential standard of review set forth in The Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), 28 U.S.C. § 2254, as interpreted by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495 (2000). This Court may not grant relief unless the North Carolina court's adjudication of a claim resulted in a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d).

A state court decision is contrary to clearly established federal law if the court "arrives at a conclusion opposite that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A state court decision is an unreasonable

application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id*. at 407. A state court decision also may be an unreasonable application of clearly established federal law if it applies Supreme Court precedent "in a different factual context from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is not reasonable [or] fails to apply the principle of a precedent in a context where such failure is unreasonable." *Robinson v. Polk*, 438 F.3d 350, 355 (4th Cir. 2006).

The Supreme Court has cautioned that an unreasonable application of federal law differs from an incorrect application of federal law. *Williams*, 529 U.S. at 410. Thus, "under 2254(d)(1)'s 'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id* at 411. In deciding whether a state court's application of clearly established federal law is unreasonable within the meaning of § 2254(d), a federal habeas court should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id*. at 409.

## B. Harmless Error Analysis

If this Court finds that trial error rising to the level of a constitutional violation occurred, the error must then be evaluated under the standard articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38, 113 S.Ct. 1710, 1722 (1993). Under the *Brecht* standard, a reviewing court must determine whether the constitutional error had a "substantial or injurious effect or influence

in determining the jury's verdict." *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253 (1946)). As such, "habeas petitioners obtain plenary review of constitutional claims, but cannot receive habeas relief based on trial error unless they establish that the error resulted in actual prejudice." *Id.* (citing *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732 (1986)).

ANALYSIS OF DAVIS'S CLAIMS[2]

CLAIM I: *Trial Court's Handling of Juror Communications*

Davis claims that the trial court's handling of two notes, one from the jury and the other from an individual juror, deprived him of his right to be present at all stages of his trial and to effective assistance of counsel. He also claims that the trial court coerced a sentence of death.

The record shows that after deliberating for about five and a half hours, the jury sent a note to the trial judge asking two questions: "Could we be furnished the last two paragraphs of Judge Payne's charge to the jury? re: our final decision[.] On Issue (4)[,] if we are 11 to one for death what happens[?]". (State Ex. 3 (R. on Appeal) 139.) The judge did not read or show the note to the parties but summarized the note as follows:

> All right. Before we bring the jury back in here, I've received a note from the jury, and part of it is "could we be furnished the last two paragraphs of the charge regarding one [sic] final decision." . . . . I think that they're talking about the instruction as it relates to the fourth issue, is my guess.
>
> They also have a question asking for "what happens if there's a division on the

---

[2]In this case, there are four (4) volumes of transcripts covering some pre-trial issues, jury selection, and opening statements. Because the bulk of those transcripts covers jury selection, references to those transcripts appear as (JS Tr. __). There are seven (7) volumes of transcripts covering the sentencing hearing. References to those transcripts appear as (Sent. Tr. __). References to the MAR evidentiary hearing transcript appear as (MAR Tr. _).

fourth issue." . . . I'm also, in regard to this question that seems to be raised, inclined to give them the charge about they have a duty to consult with each other and to re-examine their views, that they have to decide the case for themselves. It's the one right out of the pattern. I think it might be appropriate. . . . .

(Sent. Tr. 1446.) Defense counsel did not object to the court's proposed instructions but asked that the court instruct the jury "as to the results of what happens if they're not able to agree."

(Sent. Tr. 1446.) The court denied the motion, and counsel objected to the denial of the motion.

The jury returned to the courtroom, and the trial judge reinstructed the jury on Issue Four. The court also gave the following instruction, known as an "*Allen* charge"[3]:

Now, members of the jury, I would also instruct you that as to the other question that you have submitted to me, I would remind you that as jurors you've taken an oath, that you all have a duty to consult with one another and deliberate with a view to reaching an agreement if it can be done without violence to individual judgment. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. In the course of deliberations, each of you should not hesitate to re-examine your own views and change your opinion if it is erroneous, but none of you should surrender your honest conviction as to the weight or the effect of the evidence solely because of the opinion of your fellow jurors for the mere purpose of returning a verdict.

(Sent. Tr. 1449-50.)

The jury returned to deliberations at 5:12 p.m., and at 5:55 p.m. the court called the jurors back in and released them for the evening. The next morning, prior to reconvening, the court informed the parties that it had received a note from a juror. The note, addressed to Judge Payne, from Juror Colwell is as follows:

---

[3]The *Allen* charge takes its name from *Allen v. United States*, 164 U.S. 492, 501-502, 17 S.Ct. 154 (1896), in which the Court upheld the use of a supplemental instruction to a deadlocked jury.

I find I have a most difficult dilemma which I sincerely hope can be resolved.

When questioned during jury selection as to whether I could follow the law and vote for the death penalty if the prosecution proved its case, I honestly replied that I could do so in certain extreme cases. I now find that while the mitigating factors do not offset the aggravating factors in one of the murders, I cannot with any peace of mind vote for the death penalty – which must be done to obey the law. I could vote for life imprisonment, but this would not be honest. I feel unqualified to continue as a juror in this case and request that an alternate replace me.

I deeply apologize for this disruption, but feel I must be honest with the court and true to my own feelings. Having to make a decision as the law requires would cause me great mental anguish from which I would ask to be spared.

(State Ex. 3 (R. on Appeal) 147.)

The trial court did not read or show Juror Colwell's note to the parties but summarized it as follows:

Before we start, I received a written communication from one of the members of the jury through the sheriff this morning. She apparently handed it to him, and the juror is indicating they're [sic] having some difficulty following the law and has asked that I place an alternate in. As you know, I can't do that. After sentencing deliberations begin, the law does not allow me to do that. I'm inclined this morning to reinstruct them on the fourth issue. I don't want to get into the content in detail, because it's not one or two sentences; it's in length on the fourth issue.

(Sent. Tr. 1455.) The court went on to address a written motion filed by the defense seeking a special instruction on the jury's question of the previous day – "On issue (4)[,] if we are 11 to one for death what happens[?]". The defense sought the following additional instruction:

Ladies and Gentlemen, the instruction I gave you yesterday in response to your inquiry probably conveyed the erroneous impression that a unanimous decision, either for death or for life imprisonment without parole was required. An inability to reach a unanimous verdict should not be your concern, but should simple [sic] be reported to the Court.

(State Ex. 3 (R. on Appeal) 148.) The judge denied the motion as to the first sentence of the

proposed special instruction but indicated his intention to give the second sentence. Defense

counsel objected to the trial court's refusal to give the entire instruction. (Sent. Tr. 1458.) The

court brought the jury in and gave the following instructions:

> Good morning, ladies and gentlemen. Folks, I've had a communication from one
> of your members indicating that they're having some difficulty in the matter, and
> it's asked that they be replaced. The law doesn't allow me to do that. Once the
> jury deliberations begin in the sentencing phase in this type of case, I'm not
> allowed to remove someone on the jury and replace them with another juror.
> Once deliberations begin, I must let the twelve jurors that begin the deliberations
> conclude the matter.
>
> Now, yesterday one of the questions that I received was an inquiry as to what
> would happen in a certain numerical division. I will tell you that your inability to
> reach an unanimous verdict should not be your concern, but should simply be
> reported to the Court. . . . .

(Sent. Tr. 1459-60.) Following these instructions, the jury resumed deliberations at 9:14 a.m.

and reached a sentencing verdict in each case by 10:09 a.m. (Sent. Tr. 1461, 1464.)

Davis claims that he was deprived of his Sixth Amendment rights to be present and to

effective assistance of counsel by the trial court's handling of the two notes. The North Carolina

Supreme Court disagreed, and this Court concludes that the state court's adjudication was neither

contrary to nor an unreasonable application of clearly established federal law. *See* § 2254(d)(1).

"The Confrontation Clause of the Sixth Amendment and the Due Process Clause of the

Fifth Amendment together guarantee a defendant charged with a felony the right to be present at

all critical stages of his trial." *United States v. Rolle*, 204 F.3d 133, 136 (4th Cir. 2000). The

Confrontation Clause requires the defendant's presence when testimony is presented against him.

*See United States v. Camacho*, 955 F.2d 950, 953 (4th Cir. 1992) (citation omitted). The Due

Process Clause requires the defendant's presence "in some situations where the defendant is not

actually confronting witnesses or evidence against him." *United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 1484 (1985) (per curiam). "[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Id*. (citation omitted).

Davis and counsel were present when the trial court received the notes and when it instructed the jury. Therefore, Davis is arguing that he was constructively absent because the trial court failed to adequately convey the substance of the notes. As a result, Davis argues, neither he nor counsel were able to make informed decisions regarding the notes, including contesting the court's actions, *see Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052 (1984) ("Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense."), leaving him unable to participate in two critical stages at his capital sentencing proceeding.

### Jury Note Regarding Issue No. Four

As an initial matter, the jury's note regarding the 11 to one split was not, as Davis asserts, an *ex parte* communication between the judge and the jury. Davis and counsel were present when the judge announced receipt of the note. Although the judge did not read the note verbatim, he accurately summarized it for the parties – "what happens if there is a division on the fourth issue." This Court is unaware of, and Davis does not cite, any established Supreme Court precedent holding that a trial court's failure to read verbatim or to show a jury communication to the defendant or defense counsel violates that defendant's due process right to be present at all

critical stages of his trial.[4]

Furthermore, the record reflects that counsel accurately understood the juror's note from the judge's description.  After the judge announced his intention to give the "duty to consult" instruction (hereinafter "*Allen* charge"), trial counsel immediately requested that the trial court instruct the jury "as to the results of what happens if they're not able to agree."  (Sent. Tr. 1446.)  In other words, counsel wanted the jury to be told that should they fail to reach a unanimous agreement on a verdict, Davis would be sentenced to life in prison without parole.  Counsel clearly recognized that the jury wanted to know what would happen if they could not reach a unanimous verdict.  In fact, the next day the trial court confirmed that fact:

| | |
|---|---|
| MS. BURNER: | They came back about 3 o'clock yesterday afternoon and asked a question, "What happens if we can't reach a verdict?" |
| COURT: | That wasn't the question.  The question was: "What happens if we are . . ." and they gave me a numerical division which I shall not disclose. . . . |
| . . . . . | |
| MS. BURNER: | Which I assume means they had not come to a unanimous decision. |
| COURT: | You may assume that, yes, ma'am. |

(Sent. Tr. 1455-56.)  As the foregoing demonstrates, the trial court did not misrepresent and trial counsel did not misunderstand the contents of the jury's note.  As such, Davis cannot succeed on his claim that his right to be present at a critical stage of the proceedings was violated by the court's handling of the jury's note.

_____

[4]The Court notes that defense counsel did not ask to see the note or ask the judge to read the note into the record.

Nor does the record support Davis's assertion that the trial court's failure to read or show the note to counsel deprived him of effective assistance of counsel. Davis argues that had counsel known that the jury was split 11 to one for death, they could have requested an instruction pursuant to *State v. Smith,* 358 S.E.2d 329 (N.C. 1987),[5] immediately after the jury asked its question and could have argued more strongly and fully against the trial court's *Allen* charge. (Pet. ¶ 63.) Neither of these arguments has merit.

The record reflects that after the judge announced that he would give an instruction on the jury's "duty to consult," defense counsel did *not* object or argue that the *Allen* charge was inappropriate. Instead, counsel requested that the trial court instruct the jury "as to the results of what happens if they're not able to agree" (i.e. that Davis would be sentenced to life in prison without parole).[6] (Sent. Tr. 1446.) Because they did not object to the *Allen* charge in the first place, there is no merit to the argument that had they known that the division was 11 to one, trial counsel would have argued more strongly and fully against that instruction.

Furthermore, between the trial court's *Allen* charge and defense counsel's motion pursuant to *State v. Smith* the following morning, there was no further discussion between the court and counsel about the contents of the jury's note. Therefore, defense counsel clearly either did not recall *Smith* or did not discover the case until after the trial had concluded for the day. As

---

[5]In *State v. Smith*, the North Carolina Supreme Court held that when a jury inquires into the result of its failure to reach a unanimous verdict, "the trial court must inform the jurors that their inability to reach a unanimous verdict should not be their concern but should simply be reported to the court." 358 S.E.2d at 339.

[6]After the trial court denied trial counsel's motion, counsel objected to the court's refusal to give their requested instruction. (Sent. Tr. at 1446.)

such, an argument that counsel immediately would have requested an instruction pursuant to *Smith* had they known the actual numerical division among the jury has no basis in fact. Finally, had counsel been aware of *Smith* when the judge announced his intention to give an *Allen* charge, it is not likely that they would have requested an instruction that failure to reach a unanimous decision would result in a sentence of life imprisonment without parole. Such an instruction was condemned in *Smith*. 358 S.E.2d at 338-39 ("[I]t is not error to fail or refuse to instruct the jury that a sentence of life imprisonment will be imposed upon the defendant in the event the jury is unable to reach unanimous agreement on the proper sentence. . . . [T]o [so] instruct . . . would be tantamount to 'an open invitation for the jury to avoid its responsibility and to disagree.'") (quoting *State v. Smith*, 292 S.E.2d 264, 276 (N.C. 1982)).[7]

### Juror Colwell's Note

Juror Colwell's note seeking replacement by an alternate juror also was not an *ex parte* communication with the judge. Davis and counsel were present when the judge announced receipt of the note. Although the judge did not read the note verbatim,[8] the North Carolina Supreme Court found as a matter of fact that the judge "adequately summarized . . . the note from the juror." *Davis*, 539 S.E.2d at 255. The trial judge then informed the parties that he was going to instruct the jury that he was not permitted to replace a juror with an alternate once the jury had begun deliberations. There is no claim that the trial court misapplied or misinterpreted the law

---

[7]Nor is such an instruction constitutionally required. *See Jones v. United States*, 527 U.S. 373, 382, 119 S.Ct. 2090 (1999) ("We have never suggested . . . that the Eighth Amendment requires a jury be instructed as to the consequences of a breakdown in the deliberative process.").

[8]The Court notes that defense counsel did not ask to see the note or ask the judge to read the note into the record.

regarding the replacement of jurors.

Davis argues that the trial court misrepresented the content of the note by stating that a juror was having difficulty following the law when the note reveals that Juror Colwell misunderstood the law. Davis argues that had counsel known the true content of the note, they could have requested that the judge question the juror regarding her understanding of the law.

Implicit in the appellate court's finding that the trial judge adequately summarized Juror Colwell's note is a finding that the judge's description that a juror was "having some difficulty following the law" was accurate. A finding of fact by a state court is presumed to be correct. *See* § 2254(e)(1). Davis may rebut that presumption with "clear and convincing evidence." *Id*.

Davis asserts that Juror Colwell's letter shows that she believed the mitigating circumstances did not offset the aggravating factors and thus had answered "yes" to Issue Three. However, Davis argues that Juror Colwell's admissions that she "[could] not with any peace of mind vote for the death penalty . . . [but] could vote for life imprisonment" means that she had answered "no" to Issue Four. Under these circumstances, Davis argues, Juror Colwell had determined that the aggravating factors were not sufficiently significant to call for imposition of the death penalty, and therefore, the law required her to answer "no" to Issue Four. However, his argument continues, Juror Colwell's references to her inability to obey the law revealed a misapprehension of the law – namely, that North Carolina law "required" her to vote for the death penalty despite her "no" answer to Issue Four. Davis asserts that Juror Colwell's misapprehension was confirmed when during the polling of the jury, she answered, "yes in accordance with state law" when asked if she had voted for a sentence of death.

On the contrary, the record shows that Juror Colwell understood what the law required of her and that her difficulty arose because she did not want to do what the law required. This is best demonstrated by looking at the note in conjunction with the two verdicts in this case. On the "Issues and Recommendations as to Punishment" forms used for the murders of Caroline and Joyce Miller, Issue Three reads,

> Do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances found is, or are, insufficient to outweigh the aggravating circumstance (or circumstances) found?

Issue Three requires a unanimous "yes" vote before the jury can move to Issue Four. Because the jury reached Issue Four in both murders, Juror Colwell had to have voted "yes" on Issue Three for both murders.

> Issue Four of the Issues and Recommendations form reads,

> Do you unanimously find beyond a reasonable doubt that the aggravating circumstance (or circumstances) you found (is or are) sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance or circumstances found by one or more of you?

Under North Carolina law, any sentencing recommendation made by the jury must be unanimous. *See* N.C. Gen. Stat. § 15A-2000(b) (1997). A unanimous "no" vote on Issue Four requires the jury to recommend a life sentence; a unanimous "yes" vote requires the jury to recommend a sentence of death. Because the jury recommended a life sentence for Caroline, Juror Colwell had to have voted "no" on Issue Four for her murder. Consequently, she could not, as Davis suggests, have misunderstood the law to require her to vote "yes" on Issue Four, if she had voted "yes" on Issue Three. Furthermore, Juror Colwell's "no" vote in Caroline's murder

indicates that she understood the requirements of Issue Four – that she was to determine whether the aggravating circumstances were substantial enough to call for the death penalty when considered with the mitigating circumstances. Therefore, Davis's argument that Juror Colwell somehow believed that she was required to vote "yes" for the death penalty even if her answer to Issue Four was "no" is without merit.

In light of Juror Colwell's vote for a life sentence for Caroline, the note's references to her inability to obey the law in *one* of the two cases can only mean that for the murder of Joyce Miller, Juror Colwell had determined that the aggravating circumstances were sufficiently substantial to call for the death penalty. Her difficulty, therefore, was not with her understanding of the law, it was with her willingness to be responsible for the consequences of complying with the law. That is why she wanted to be replaced with an alternate.

For the foregoing reasons, Davis has failed to provide clear and convincing evidence to overcome the State court's finding that the trial court adequately summarized Juror Colwell's note. Because the trial court adequately summarized the note, Davis cannot show that his rights to be present and to effective assistance of counsel were violated.[9] Therefore, the North Carolina Supreme Court's rejection of these claims was neither contrary to nor an unreasonable

---

[9]In his Reply in Support of the Petition for Writ of Habeas Corpus and Answer to the State's Motion to Dismiss, Davis urges the Court to consider the post-conviction affidavit of Faye Burner. However, because this affidavit was not part of the record on appeal, it was not available for consideration by the North Carolina Supreme Court, which was the only state court to adjudicate this claim on the merits. Davis filed this affidavit to support his MAR. To the extent that Davis raised this claim in his MAR, the MAR court held that it was procedurally barred. Therefore, this Court is precluded from considering the affidavit in its analysis of this claim. *See Wilson v. Moore*, 178 F.3d 266, 272-73 (4th Cir. 1999) (refusing to consider evidence submitted in support of a § 2254 claim because the evidence had not been submitted to the last state court that had adjudicated the claim on the merits).

application of clearly established federal law.

## Juror Coercion Claim

Davis asserts that the trial court's *Allen* charge in response to the jury's note was coercive. Davis asserts further that the coerciveness of the *Allen* charge was compounded by the trial court's response to Juror Colwell's note. Davis claims that the trial court's actions coerced a sentence of death for the murder of Joyce Miller. Although Davis clearly raised this claim on direct appeal (State Ex. 4 (Def.-Appellant's Br. on Appeal) 53-59), the North Carolina Supreme Court did not explicitly address it.[10] Because it is unclear whether the court addressed this issue, this Court's review will be *de novo*. *See Weeks v. Angelone*, 176 F.3d 249, 263 (4th Cir. 1999).

A criminal defendant tried by a jury is "entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241, 108 S.Ct. 546 (1988). However, the Supreme Court also has approved the use of supplemental instructions when a jury has reached an impasse in deliberations and is unable to reach a verdict. *See Booth-El v. Nuth*, 288 F.3d 571, 580 (4th Cir. 2002) (citing *Allen v. United States*, 164 U.S. 492, 501-02, 17 S.Ct. 154 (1896)). Whether to give a supplemental charge is within the discretion of the trial or sentencing court. *See id*. (citation omitted); *State v. Williams*, 338 S.E.2d 75, 85 (N.C. 1986). Because Davis did not object to the *Allen* charge, this Court reviews the sentencing court's actions for plain error. *See U.S. v. Martin*, 756 F.2d 323, 326 (4th Cir. 1985); *State v. Bussey*, 361 S.E.2d 564, 566 (N.C. 1987).

---

[10]The State argues that the North Carolina Supreme Court implicitly addressed this claim when it adjudicated Davis's other constitutional claims on the merits. However, the State court opinion did not mention the Due Process Clause of the United States Constitution or any of the factors that might be relevant to determining the existence of juror coercion.

In reviewing the propriety of a court's supplemental instruction, the instruction must be viewed "in its context and under all the circumstances" to determine whether it was coercive. *See Booth-El*, 288 F.3d at 581 (quoting *Lowenfield*, 484 U.S. at 237). Some of the relevant factors to consider are: any suggestions or threats that the jury would be kept until a unanimous decision is made; any suggestions or commands that the jury must reach a unanimous decision; evidence that the trial court knew the numerical division of the jury; indications that the supplemental instruction was directed at the minority; the length of the deliberations following the charge; the total length of deliberations; and whether the jury requested additional instruction. *See Tucker v. Catoe*, 221 F.3d 600, 611 (4th Cir. 2000). In general, an *Allen* charge will be upheld as long as it is "fair, neutral, and balanced." *Id*. at 610 (quotation omitted).

In this case, after deliberating for about five and a half hours, the jury sent out a note asking to be reinstructed on Issue Four and asking, "On Issue (4)[,] if we are 11 to one for death what happens[?]". (State Ex. 3 (R. on Appeal) 139.) The trial court announced its intention to give an *Allen* charge. Davis did not object but instead requested that the court instruct the jury "as to the results of what happens if they're not able to agree." (Sent. Tr. 1446.) The trial court denied the request. The court reinstructed the jury on Issue Four and then gave an *Allen* instruction. The jury resumed deliberations at 5:12 p.m. At 5:55 p.m., the court called the jury in and asked the jury foreman whether he thought it would be beneficial for the jury to continue working or to go home and continue in the morning. The foreman asked that the jury be released for the night. (Sent. Tr. 1452.) At 9:10 a.m. the next morning, the judge informed the jury that one of its members had asked to be replaced by an alternate. He told the jury that he was not able to replace a juror once deliberations had begun. He also gave the jury the following

21

supplemental instruction, "Now, yesterday one of the questions that I received was an inquiry as to what would happen in a certain numerical division. I will tell you that your inability to reach a unanimous verdict should not be your concern, but should simply be reported to the Court." (Sent. Tr. 1460.) The jury resumed deliberations at 9:14 a.m. The jury announced that it had reached a verdict at 10:09 a.m. After hearing eight days of evidence in a double homicide, the jury returned a life sentence and a death sentence after deliberating for roughly seven hours.[11]

Looking first at the language of the *Allen* charge itself, the Court notes that it was balanced, instructing jurors in the majority and the minority that, "each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors," and that, "each of you should not hesitate to re-examine your own views and change your opinion if it is erroneous." (Sent. Tr. 1449-50.) Most importantly, the judge instructed the jurors not to abandon their individual judgments: "you all have a duty to consult with one another and deliberate with a view to reaching an agreement *if it can be done without violence to individual judgment. . . . [N]one of you should surrender your honest conviction* as to the weight or the effect of the evidence solely because of the opinion of your fellow jurors *for the mere purpose of returning a verdict*." (Sent. Tr. 1449-50) (emphasis added.) In short, the charge, was "fair, neutral and balanced." *See Tucker*, 221 F.3d at 610 (citation omitted).

Although the trial judge knew the numerical breakdown of the division on Issue Four

---

[11]Davis asserts that the jury deliberated for over seven hours on the *first* day of deliberations. Davis's math works only if court-ordered breaks, including lunch, are included in the jury's deliberation time. Excluding court-ordered breaks and 30 minutes for lunch, the actual deliberation time for the first day was about 6 hours and 15 minutes and a little under an hour for the second day.

when he gave the *Allen* charge, that in and of itself did not make it coercive. *See United States v. Sawyers*, 423 F.2d 1335 (4th Cir. 1970) (no coercion in a case where judge knew division prior to giving an *Allen* charge). As an initial matter, the judge did not seek the information, the jury included it in the note. Additionally, there was no indication that the jury was hopelessly deadlocked; indeed, the jury sought an instruction related to its division. *Cf. Tucker*, 221 F.3d at 612 (the jury's emphatic and unequivocal communication of a deadlock and the absence of a request for further instruction were evidence of coerciveness). Furthermore, it was not unreasonable for the trial court to require the jury to continue deliberations, despite its narrow division. The jury had deliberated for five and a half hours, not a particularly long time considering that it was tasked with recommending sentences for two murders, involving a total of six aggravating circumstances and 100 mitigating circumstances. *See Lowenfield*, 484 U.S. at 238 ("Surely if the jury had returned from its deliberations after only one hour and informed the court that it had failed to achieve unanimity on the first ballot, the court would have had the authority to insist that they deliberate further."); *see also Green v. French*, 143 F.3d 865, 887 (4th Cir. 1998) (rejecting juror coerciveness claim in case where jury had deliberated for approximately six hours prior to *Allen* charge), *overruled on other grounds by Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495 (2000); *United States v. Martin*, 756 F.2d 323, 327 (4th Cir. 1985) (en banc) (rejecting juror coerciveness claim in case where jury had deliberated for approximately eight hours prior to *Allen* charge). Finally, the jury's request for a reinstruction on Issue Four and an instruction on their numerical division on Issue Four indicates that the jurors expected to continue their deliberations on Issue Four after the judge's further instructions.

The amount of time that the jury took to reach its verdict after the *Allen* charge also does

not indicate coercion.  When the judge called the jury back 45 minutes after the *Allen* charge, there was no indication that the jury was any closer to a verdict.  In fact, the judge tried to ascertain whether that was the case when he offered to let the jurors continue deliberating if they were close.  Instead the jury foreman indicated that an overnight rest would be more beneficial.  The jury then deliberated for an additional 45 minutes to almost an hour the next day before returning a verdict.  The hour and a half to almost two hours of deliberations after the *Allen* charge accounted for about one quarter of the jury's entire deliberation time.  Again, the court notes that this was a double homicide for which the jury had to consider two aggravating circumstances in one case and four in the other.  Additionally, the jury was tasked with considering 50 mitigating circumstances in each case, and it is clear that the jury did consider them for each case because although the submitted circumstances were the same, the jury found different mitigating circumstances to exist in each case.  Therefore, seven hours of total deliberation time was not exceptionally long and also not indicative of coercion.

The trial judge also did not advise or suggest that a unanimous verdict was required.  He properly reinstructed the jury on Issue Four as requested, and there was nothing in the *Allen* charge that implied a unanimous verdict was required.  Furthermore, the next morning, after Juror Colwell's note revealed that the jury still had not reached a unanimous verdict in at least one of the cases, the judge instructed the jury that its inability to reach a unanimous verdict should not be its concern but merely should be reported to the court.  Therefore, any lingering doubt as to whether a unanimous decision was required before the jury would be released would have been dispelled at that point.  Indeed, the jury continued its deliberations for another 45 minutes to almost an hour after that.

Davis argues that the court's statement that, "[O]nce deliberations begin, I must let the twelve jurors that begin the deliberations conclude the matter," implied that a unanimous verdict was required. As an initial matter, this statement was not part of the *Allen* charge and was in no way related to it in context or in time. It came the morning after the *Allen* charge as part of the trial judge's response to Juror Colwell's request to be replaced by an alternate juror. In any event, in the extreme unlikelihood that Juror Colwell or any other juror inferred the statement to require a unanimous verdict, that belief would have been dispelled by the judge's very next instruction that the jury's inability to reach a unanimous verdict should not be its concern but should simply be reported to the court. (Sent. Tr. 1459-60.)

Nor does the Court agree that Juror Colwell's letter to the judge is evidence that she felt coerced by the *Allen* charge. Nothing in the letter supports the notion that she was feeling coerced to vote for the death penalty. The letter merely reflects that Juror Colwell wanted to be relieved of her responsibilities as a juror because she was having a difficult time complying with the law. There is nothing in the letter to indicate that her dilemma began only after the judge gave the *Allen* charge.

Finally, the Court is not persuaded by Davis's argument that the trial court's response to Juror Colwell's note coerced her to vote for the death penalty. In fact, the Court does not see the basis for Davis's assertions that in his response, the judge "singled Juror Colwell out in front of the jury, belittled her moral position, and [ ] communicated to her and the rest of the jury that the trial court was not satisfied with her service." (Pet. ¶ 54.) In his remarks to the jury, the judge did not disclose the note-writer's name or gender nor did he give any hint of the nature of the note-writer's difficulty or why the note-writer wanted to be replaced. While the jury was free to

25

speculate about who might have written the note and why, the judge protected Juror Colwell's identity and confidences to the extent that he could.

The Court also finds no merit to Davis's assertion that the judge's description to the jury that one of its members was "having some difficulty in the matter" belittled Juror Colwell's moral position. Juror Colwell described herself as having a "difficult" dilemma. The judge's use of the word "difficulty" was neither coercive nor "belittling."

Finally, the Court can find no support for the assertion that the judge communicated to Juror Colwell that he was displeased with her service when he informed the jury that he could not replace a juror once deliberations had begun. She asked if she could be replaced, and the judge answered her question. Davis has not cited, and this Court is unaware of, any law supporting the notion that an accurate response to a juror's question – even if it is in the negative – can be deemed coercive.

For the foregoing reasons, the trial court's *Allen* charge was not coercive. Therefore, it was not plain error for the sentencing court to issue the *Allen* charge in this case.

CLAIM II: *Juror Misconduct Claim*

Davis claims that he was prejudiced by "unauthorized communications" between Juror Colwell and her husband during the sentencing trial and deliberations. After holding an evidentiary hearing on the issue, the MAR court rejected the claim on the merits.

At the MAR hearing, evidence was presented that Mr. Colwell, who was retired, attended most of the sentencing hearing and that he and his wife frequently had lunch together during the sentencing proceedings. Both Mr. and Mrs. Colwell testified that they avoided talking about the

trial, but Mr. Colwell acknowledged that they occasionally talked about the people involved in the trial – the judge, the lawyers, and some of the witnesses.

Among the protections guaranteed by the Sixth Amendment is the right to an impartial jury that determines its verdict "based upon the evidence developed at trial." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639 (1961); *see also Turner v. Louisiana*, 379 U.S. 466, 472-73, 85 S.Ct. 546 (1965) ("[T]he evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.") (internal quotation marks omitted). An impartial jury is one free from extraneous, prejudicial influence, whether it comes from inside or outside the jury room. *See Parker v. Gladden*, 385 U.S. 363, 363-65, 87 S.Ct. 468, 470 (1966) (finding habeas petitioner was deprived of his right to an impartial jury because of prejudicial remarks made to the jury by a bailiff); *Stockton v. Virginia*, 852 F.2d 740, 743-46 (4th Cir. 1988) (granting habeas relief where jurors were exposed to prejudicial remarks of a non-juror).

In *Remmer v. United States*, the U.S. Supreme Court held that "any private communication [or] contact . . . with a juror during a trial about the matter pending before the jury is . . . presumptively prejudicial . . . ." 347 U.S. 227, 229, 74 S.Ct. 450 (1954). The Supreme Court has long held that extrajudicial remarks directed at influencing a juror's resolution of an issue under deliberation, even isolated remarks, may contravene the constitutional guarantee of a fair trial. *See Parker*, 385 U.S. at 363-65.

In order for Davis to succeed on this claim, he must first show that any extrajudicial remarks Mr. Collwell made to his wife were about the "matter pending before the jury."

*Remmer*, 347 U.S. at 229. The MAR court made a number of findings of fact, including findings that "juror . . . Colwell and her husband . . . did not discuss any of the substantive matters of the trial," and that "Mr. Colwell never expressed any opinion that he had about the case to his wife." Based upon those findings of fact, the MAR court concluded that there was no evidence to support Davis's contention that juror Colwell was improperly influenced by her husband or that any extraneous, prejudicial evidence was brought to her attention. As noted previously, a finding of fact by a state court is presumed to be correct, and Davis bears the burden of rebutting that presumption "by clear and convincing evidence." § 2254(e)(1).

Davis argues that Mr. Colwell's acknowledgment that he and his wife discussed the "appearance and demeanor" of some of the witnesses is evidence that Juror Colwell and her husband discussed substantive matters regarding the trial. (MAR Tr. 86.) However, it is evident from Mr. Colwell's subsequent explanation that what he and his wife occasionally discussed was the physical appearance of some of the people who appeared in court. As an example of what he meant by "appearance and demeanor," Mr. Colwell testified that prior to being called to the stand, he and another member of Davis's jury, who also was scheduled to testify at the MAR hearing, were in the hall outside the courtroom and saw an attorney in an ill-fitting suit. They discussed the suit and the impression it might have on a jury. (MAR Tr. 86-7.)

Davis has provided no evidence of what, if anything, Mr. Colwell actually said to his wife about any particular witness at trial. Furthermore, there was no evidence that either Juror Colwell or her husband discussed any witness's testimony or credibility.[12] As such, Davis has

---

[12]In the instant claim, Davis implies that Mr. Colwell discussed witnesses' appearances with at least one other juror during the trial. (Pet. ¶ 85, citing MAR Tr. 87.) However, Mr.

failed to provide sufficient evidence to overcome the MAR court's finding of fact that the

Colwells did not discuss any substantive matter pertaining to the trial. Therefore, the MAR

court's rejection of this claim was neither contrary to nor an unreasonable application of clearly

established federal law. *See* § 2254(d)(1).

CLAIM III: *Trial Court's Exclusion of Davis's Letters to his Mother*

Davis claims that the trial court erred by excluding letters that he had written to his

mother while he was incarcerated and awaiting trial. Davis contends that the letters were

relevant, admissible mitigating evidence showing his remorse for the murders.

At the sentencing hearing, Davis's mother, Phyllis Davis, testified on his behalf as the first

defense witness. On direct examination, Ms. Davis testified that her son had communicated with

her through letters since his arrest for the murders. She produced letters written to her by Davis.

Defense counsel requested that Ms. Davis be allowed to read the letters to the jury and proffered

them as exhibits tending to show defendant's remorse. In the letters, Davis asks for his mother's

forgiveness for what he has done, expresses his hope that God and the family will forgive him,

asks for his mother's prayers and indicates that he is praying for her, and admits that he cries

himself to sleep every night and that he cannot get the thought of what happened out of his head.

(Pet'r Ex. 7 (Def.'s Trial Exs. 16, 18, 21).)

The State objected to admission of this evidence, arguing that it was unreliable hearsay

because Davis had written the letters while incarcerated awaiting a possible death sentence. The

---

Colwell's testimony clearly states that his discussion with the other juror about the attorney in the
ill-fitting suit occurred on the day of the MAR hearing, not during the trial. (MAR Tr. 87.)

trial court deferred ruling on the admissibility of the letters but allowed Ms. Davis to testify that Davis had written her a number of letters that were personal in nature; that the sense she got from the letters was that Davis was sorry for what he had done to their family; that when she had attempted to talk to him about the murders, he cried and was unable to discuss what had happened; and that when she had visited him, he was remorseful and cried whenever she mentioned her sister, Joyce. At the conclusion of all of the evidence, the trial court excluded the letters on the grounds that they were unreliable and that they were cumulative of other evidence offered to show remorse. (Sent. Tr. 1192-93.)

Under North Carolina law, the rules of evidence do not apply in sentencing proceedings. *See* N.C. Gen. Stat. § 8C-1, Rule 1101(b)(3) (1997). However, hearsay statements introduced at sentencing must be relevant and bear indicia of reliability. *See Davis*, 539 S.E.2d at 258 (citing *State v. Stephens*, 493 S.E.2d 435, 442 (N.C. 1997)). The North Carolina Supreme Court held that the trial court properly excluded the letters as cumulative and unreliable.

The state court's conclusion that the letters were inadmissible under North Carolina's evidentiary rules is not subject to review by this Court. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475 (1991). The Court assumes that the state court properly applied state law.

However, in the case of evidence offered in mitigation at the sentencing phase of a capital trial, "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of

the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954 (1978); *see also Eddings v. Oklahoma*, 455 U.S. 104, 113-14, 102 S.Ct. 869 (1982). Consequently, the U.S. Supreme Court has recognized that in some instances, a defendant's right to present evidence in mitigation supersedes a state's interest in enforcing its rules of evidence. *See, e.g., Green v. Georgia*, 442 U.S. 95, 97, 99 S.Ct. 2150 (1979) (holding exculpatory statements by a third party should have been admitted in the punishment phase, notwithstanding the hearsay rule); *see also Boyd v. French*, 147 F.3d 319, 326 (4th Cir. 1998) ("The Due Process Clause of the Fourteenth Amendment may require the admission of mitigating evidence even if state-law rules of evidence . . . would exclude it.").

Remorse is an important relevant mitigating factor in a capital sentencing proceeding. *See Jones v. Polk*, 401 F.3d 257, 264 (4th Cir. 2005) (citations omitted). Short of a defendant taking the stand, often the only way to present evidence of remorse is through the hearsay testimony of others. Consequently, under the holdings of *Lockett* and its progeny, a state may not apply its evidentiary rules such "'that . . . evidence [of remorse] could never be part of the sentencing decision at all.'" *Id*. at 263 (quoting *Johnson v. Texas*, 509 U.S. 350, 362, 113 S.Ct. 2658 (1993)) (alteration added).

In this case, Davis was permitted to present evidence of remorse, not only through his mother's testimony but also through testimony of family and friends to whom he had spoken and written. His brother, Patrick, testified that Davis cried whenever the two spoke about the murders. He also testified on cross-examination that Davis had said that he was sorry for what he had done. (Sent. Tr. 1101-02.) Davis's aunt, Marion Mays, testified that Davis had sent her two letters in which he had asked her and the rest of the family to forgive him for what he had done. (Sent. Tr

1149-50.)  Davis's cousin, Nicole Rice, testified that she had visited Davis in jail and believed

him to be remorseful.  (Sent. Tr. 1161.)  The Reverend Carson Mosley testified that he visited

Davis weekly in jail and that Davis became very emotional whenever the subject of the murders

came up.  Reverand Mosely also believed Davis to be remorseful.  (Sent. Tr. 1167-68.)  Richard

Green, Davis's former principal who had visited him in jail, testified that Davis had told him that

he was sorry for what he had done and that he appeared remorseful.  (Sent. Tr. 1186.)  Finally, Dr.

Jerry Noble, Davis's mental health expert at trial, testified that he had seen signs of remorse in

Davis.  He testified that Davis's suicidal thinking, difficulty sleeping, nightmares, and increased

interest in religion since the murders were indications of remorse.  (Sent. Tr. 994.)

Almost all of the aforementioned evidence was hearsay testimony, so the trial court clearly

did not apply the state's evidentiary rules in such a way to as to exclude all evidence that would

support the mitigating factor of remorse.[13]  Nevertheless, Davis asserts that the trial court's

exclusion of his letters to his mother violated his right to present relevant mitigating evidence.

The Supreme Court has never held that a trial court must admit any and all proffered

mitigating evidence no matter how irrelevant, unreliable or cumulative.  *See Lockett*, 438 U.S. at

604 n.12 ("Nothing in this opinion limits the traditional authority of a court to exclude, as

irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of

his offense."); *see also Green*, 442 U.S. at 97 (finding due process violation based upon "unique

circumstances" of the case where excluded hearsay evidence was "highly relevant to a critical

---

[13]Contrast Davis's case with *Jones*, in which the Fourth Circuit held that the trial court
erred in excluding on hearsay grounds the only evidence of remorse that the defendant had
offered.  401 F.3d at 264.

issue in the punishment phase" and "substantial reasons existed to assume its reliability").  Indeed, a number of circuit courts, including the Fourth Circuit, have recognized that "the principles developed in *Lockett* and *Eddings* do not eviscerate all state evidentiary rules with respect to mitigating evidence offered in capital sentencing proceedings."  *Fullwood v. Lee*, 290 F.3d 663, 692 (4th Cir. 2002) (citation omitted); *Brown v. Luebbers*, 371 F.3d 458, 467-69 (8th Cir. 2004); *Alley v. Bell*, 307 F.3d 380, 398 (6th Cir. 2002) ("[N]othing in the Supreme Court cases cited by Alley compels the conclusion that state courts do not retain some discretion to apply their rules of evidence at the sentencing phase."); *Sallahdin v. Gibson*, 275 F.3d 1211, 1237 (10th Cir. 2002) (*Lockett* line of cases "indicates that proffered mitigation evidence must be reliable and relevant to be admitted."); *Buchanan v. Angelone*, 103 F.3d 344, 349 (4th Cir.1996) (excluding mitigating evidence that "would have had only cumulative probative value" did not rise to the level of a constitutional violation), *aff'd*, 522 U.S. 269, 118 S.Ct. 757 (1998).

The trial court and the North Carolina Supreme Court found that Davis's letters would have offered substantially the same evidence of remorse as the testimony of Davis's mother and the other aforementioned witnesses.  Petitioner has failed to overcome these presumptively correct findings of fact with clear and convincing evidence.  *See* § 2254(e)(1).  Furthermore, even if the letters were not cumulative of other evidence of remorse, Davis has failed to show that the trial court erred in excluding them under the state's hearsay rules.

In *Green v. Georgia*, the U.S. Supreme Court held that application of the state's hearsay laws violated the defendant's due process rights because the proffered mitigating evidence was "highly relevant to a critical issue in the punishment phase" and "substantial reasons existed to assume its reliability."  442 U.S. at 97.  Those "substantial reasons" were that the hearsay

statement was made spontaneously to a close friend; ample evidence corroborated the hearsay statement; the statement was against interest; there was no reason to believe that the declarant had any ulterior motive for making it; and most importantly, the state had considered the hearsay statement reliable enough to use it against the declarant at *his* trial. *See id.* In contrast, as the trial court found, the hearsay statements in Davis's letters to his mother were written by Davis while he was incarcerated awaiting a capital sentencing hearing; the first letter was not written until five months after his arrest; the letters were written to someone likely to be called as a favorable witness; and the recipient of the hearsay statements was not able to observe Davis's demeanor, his attitude or any of his conduct when he put his statements in writing. On the other hand, Patrick Davis, Nicole Rice, Reverend Mosely, and Richard Green were able to see and/or hear Davis when he expressed or exhibited signs of remorse to them. As such, if asked, they could have testified about his demeanor, attitude, and actions at the time. In fact, several described him as highly emotional and tearful. Based upon the foregoing, this Court cannot say that the North Carolina Supreme Court's rejection of this claim was either contrary to or an unreasonable application of clearly established federal law. *See* § 2254(d)(1).

Furthermore, even if it was error for the trial court to exclude the letters, Davis cannot show that it had a "substantial and injurious effect" on the outcome of his sentence. *Brecht*, 507 U.S. at 637.[14] Davis offered substantial mitigating evidence regarding his background, upbringing

---

[14]The North Carolina Supreme Court held that even if the trial court had erred in excluding the letters, the error was "harmless beyond a reasonable doubt" pursuant to *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824 (1967). Notwithstanding the state court's application of the *Chapman* standard, on collateral review harmlessness is assessed under the "substantial and injurious effect" standard set forth in *Brecht v. Abrahamson*, 507 U.S. at 637. *See Fry v. Pliler*, 127 S.Ct. 2321, 2328 (2007) (holding that the *Brecht* standard applies on collateral review

and mental status at the time of the murders. The trial judge did not bar Davis categorically from presenting evidence demonstrating his remorse for murdering Joyce Miller. A number of family members and friends testified regarding his remorse. Additionally, the jury was able to observe Davis's demeanor at the sentencing proceeding, during which he apparently cried a good deal. However, the jury did not find as a mitigating circumstance that Davis had shown remorse. Joyce Miller's murder was gruesome and brutal, and Davis's actions in the immediate aftermath of that murder appeared anything but remorseful. He went shopping; he cruised and smoked marijuana with friends; he went dancing. This Court is not convinced that admission of the letters would have tipped the scales in favor of a life sentence for the murder of Joyce Miller.

CLAIM IV: *Ineffective Assistance of Counsel Claim Surrounding Guilty Plea*

In this claim, Davis asserts that but for the unreasonable acts of trial counsel, he would not have entered a plea of guilty to the charges of first-degree murder of his aunt and cousin. Specifically, Davis asserts that his guilty plea was not knowing and intelligent because counsel failed to adequately investigate whether his confession to police could be suppressed and because counsel failed to inform him of "the advice of expert attorneys not to enter a guilty plea." (Pet. ¶ 103.) The MAR court denied this claim on the merits without an evidentiary hearing, concluding that it was reasonable for counsel to recommend that Davis plead guilty in light of his confession and the State's overwhelming evidence of guilt.

In *Strickland v. Washington*, the United States Supreme Court articulated a two-pronged

---

regardless of whether the state appellate court reviewed the error for harmlessness under the *Chapman* standard).

test to determine whether "counsel's assistance was so defective as to require reversal of a conviction or death sentence." 466 U.S. 668, 687-88, 104 S.Ct. 2052 (1984). Davis first must show that counsel's representation was deficient and must next show that counsel's errors prejudiced the defense so seriously "as to deprive the Defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial can not be relied on as having produced a just result." *Id* at 686.

As the United States Supreme Court noted in *Lockhart v. Hill*, "[t]he longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" 474 U.S. 52, 56, 106 S.Ct. 366 (1985) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S.Ct. 160, 164 (1970)). When a petitioner enters a plea upon the advice of counsel but subsequently claims that his plea was involuntary, the voluntariness of the plea "depends upon whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" *Id.* (quoting *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449 (1970)). A petitioner also must show that but for counsel's errors, "there is a reasonable probability that, . . . he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 59.

As an initial matter, the Court cannot find any discernable evidence in the record that trial counsel sought the advice of anyone regarding whether Davis should enter a guilty plea. Likewise, Davis has provided no discernable evidence to support his assertion that "expert" attorneys advised that he not enter a guilty plea. Davis asserts that notes from a consultation with two attorneys from the Center for Death Penalty Litigation (hereinafter "CDPL") reflect that trial

counsel were advised not to plead their client guilty. (Pet'r Ex. 18 (Trial Counsel Notes).) The Court has reviewed those notes and finds the following: the notes are written in a type of short-form, follow no apparent pattern but jump from subject to subject, and in many places are unintelligible. The Court has deciphered what it can of the notes and can find nothing in them to indicate that a guilty plea was discussed, much less that a particular recommendation was made.

Furthermore, even if several "expert" attorneys had recommended that Davis not plead guilty, counsel would not have been deficient for failing to share that information with Davis. A criminal defendant has the right to qualified and competent counsel but not to unlimited review of his case by other experienced defense attorneys. Davis fails to cite, and this Court is unaware of, any case citing as deficient conduct an attorney's failure to share with the defendant the opinions of attorneys who do not represent the defendant.

Accepting *arguendo* Davis's self-serving assertion that had he only known that the voluntariness of his confession was subject to attack, he would not have pled guilty, the Court concludes that he still may not succeed on this claim. As the Supreme Court stated in *McMann*, "a defendant's plea of guilty based on reasonably competent advice is an intelligent plea not open to attack on the ground that counsel may have misjudged the admissibility of the defendant's confession." 397 U.S at 770 (footnote omitted). As is clear from the evidence presented by Davis, counsel's plea advice was based upon the strength of the State's evidence separate and apart from the confession, as well as the absence of any defenses to the first-degree murder charges.[15] For example, Davis had made statements, both oral and written, to a number of people

_____

[15]Davis's evidence in support of his claim includes post-conviction affidavits and documents drafted at the time of his sentencing trial. To the extent that the affiants' post-

acknowledging that he had murdered his aunt and cousin, including "a Christmas letter that he sent to every sibling of his mother's, telling them how sorry he was [that] he had [killed their sister and niece] and asking for their forgiveness." (Pet'r Ex. 17 (Suppression Memo) ¶ 5.) Counsel believed that these other statements "would surely convict [Davis]." (Pet'r Ex. 17 (Suppression Memo) ¶ 5.) Furthermore, they knew that Davis had threatened his cousin Caroline shortly before her murder. (Sent. Tr. 24.) Counsel also were faced with the brutal nature of the crimes: Caroline was shot multiple times, including once in the head at close range, while she lay helpless on her bed; Joyce Miller was shot and then hacked repeatedly with a meat cleaver. Their bodies were left in the house with Joyce Miller's two young foster children, who may have witnessed all or part of Joyce's murder. Finally, counsel knew that they had no legitimate defenses to the murders. (Pet'r Ex. 15 (Aff. of Faye Burner) ¶¶ 7, 10.)

In light of the overwhelming evidence of guilt, the circumstances of the crimes, and the absence of legitimate defenses, it was reasonable for trial counsel to conclude that Davis would be found guilty of two counts of first-degree murder if he went to trial. Therefore, they believed that their best strategy was to focus on trying to save Davis's life. They also believed that a "not guilty" plea would undermine their credibility at the sentencing phase where they intended to

_____

conviction recollections conflict with their contemporaneous writings, the Court considers the contemporaneous writings to be the more reliable as they were written at the time of the proceedings at issue. For example, Faye Burner's post-conviction affidavit states that one of the reasons she and co-counsel advised Davis to plead guilty was because they believed his confession was solid. (Pet'r Ex. 15 (Aff. of Faye Burner) ¶ 7.) However, a contemporaneous trial memo indicates that the decision to plead guilty was made before trial counsel had reached a final decision about whether to file a motion to suppress Davis's confession. (Pet'r Ex. 17 (Suppression Memo) ¶ 5) ("[K]nowing that we have made the decision to plead Phillip, it seems to us that we are in a better position in front of a jury to just go ahead and follow our strategy to save Phillip's life . . . [and] not to try to suppress his confession.")

show that Davis was deeply remorseful.  (Pet'r Ex. 15 (Aff. of Faye Burner) ¶ 11.)

When representing a patently guilty client, it may be reasonable for an attorney to advise his client to abandon the hope of an unlikely acquittal in the interest of pursing the more realistic goal of a obtaining a life sentence.  *See, e.g., Young v. Catoe*, 205 F.3d 750, 760 (4th Cir. 2000) (holding counsel not deficient for admitting patently guilty defendant's guilt in order to maintain his credibility with the jury at sentencing where he hoped to save the defendant's life); *see also Jones v. Page*, 76 F.3d 831, 845 (7th Cir. 1996) (holding that attorney's strategy and advice that the defendant plead guilty, waive jury sentencing, and testify before judge, showing remorse for killings, was reasonable in light of slim chances for acquittal).  The record indicates that Davis's attorneys investigated possible defenses, assessed the strength of the State's case, and, based on the circumstances of the case, made a strategic choice to focus their efforts on saving Davis's life rather than contesting guilt.  As such, their advice and recommendation to Davis that he plead guilty was "within the range of competence demanded of attorneys in criminal cases."  *McMann*, 397 U.S. at 771.  For the foregoing reasons, the MAR court's conclusion that counsel were not ineffective for advising Davis to plead guilty was not contrary to or an unreasonable application of clearly established federal law.  *See* § 2254(d).

CLAIM V: *Ineffective Assistance of Counsel for Failing to File a Motion to Suppress Confession*

Davis claims that trial counsel were ineffective for failing to file a motion to suppress his confession to police.  Specifically, Davis asserts that trial counsel were deficient for failing to fully investigate whether his confession was voluntary and whether his waiver of *Miranda* rights was knowing and intelligent.  Davis claims also that counsel were ineffective for failing to inform

him "of the advice obtained from expert, experienced capital attorneys to file a motion to suppress the confession." (Pet. ¶ 139.) The MAR court denied this claim on the merits without holding an evidentiary hearing.

The standard for assessing counsel's competence under *Strickland* is whether his "assistance was reasonable considering all the circumstances." 466 U.S. at 686. The test is not whether Davis's new lawyers, with the benefit of hindsight, would have acted differently, but whether "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. When the thoroughness of counsel's investigation is challenged, a reviewing court must assess whether counsel's decision not to investigate or to abandon further investigation was itself reasonable. *See Wiggins v. Smith*, 539 US 510, 523, 123 S.Ct. 2527 (2003). A determination of reasonableness requires a "context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Strickland*, 466 U.S. at 688. Furthermore, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. . . . [W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Id*. at 690-91.

The Court has reviewed the exhibits Davis filed in support of his MAR, as well as the trial transcript, to determine whether the MAR court's rejection of Davis's ineffective assistance of counsel (hereinafter "IAC") claim was contrary to or an unreasonable application of *Strickland v. Washington*. 466 U.S. at 686-91. The evidence shows that counsel's decision not to file a motion to suppress was based upon a reasonable investigation.

Contemporaneous evidence shows that trial counsel had questions regarding the voluntariness of Davis's confession and whether he was competent to knowingly and intelligently waive his *Miranda* rights. (Pet'r Ex. 17 (Suppression Memo) ¶ 3.) Therefore, they asked Dr. Noble, a psychologist, to investigate whether Davis had the capacity to knowingly and intelligently wave his *Miranda* rights. (Pet'r Ex. 14 (Letter from Jerry Noble to Trial Counsel) ¶ 2.) Dr. Noble reported back to counsel that in his opinion, based upon the totality of circumstances, Davis's confession was not voluntary. (Pet'r Ex. 8 (Aff. of Jerry Noble) ¶ 9.) Furthermore, Dr. Noble informed counsel that in his opinion, Davis's "ability to make a knowing and intelligent waiver had been somewhat limited" and indicated that he would like to see more "raw data" regarding the circumstances of the confession. (Pet'r Ex. 8 (Aff. of Jerry Noble) ¶ 9.)

After receiving Dr. Noble's opinions, trial counsel consulted two attorneys from the North Carolina Appellate Defender's Office, Marshal Dayan and Janine Fodor. (Pet'r Ex. 17 (Suppression Memo) ¶ 3.) Davis contends that Dayan and Fodor advised trial counsel to file a motion to suppress his confession and cites Fodor's post-conviction affidavit as support.[16] In truth, Ms. Fodor indicated that she had very little recollection of the conversation but did recall that there was a discussion about possible grounds for filing a motion to suppress. (Pet'r Ex. 19 (Aff. of Janine Fodor) ¶ 6.) Trial counsel, on the other hand, drafted a pre-trial Suppression

---

[16]Davis also asserts that trial counsel consulted two attorneys from the CDPL, Kenneth Rose and Jonathan Broun, and that they too recommended filing a motion to suppress. Davis has filed no clear documentary evidence to support this assertion. As he did in Claim IV, Davis relies upon notes from trial counsels' consultation with the two attorneys from the Center. (Pet'r Exh. 18 (Trial Counsel Notes).) The Court has reviewed these notes, and while they indicate that a motion to suppress was discussed, this Court cannot find anything in the notes stating that Broun and Rose recommended that trial counsel file such a motion.

Memo on August 3, 1997, in which they detailed their reasons for not filing a motion to suppress. (Pet'r Ex. 17 (Suppression Memo).)  That memo states that Mr. Dayan recommended that they *consider* filing a motion to suppress.  Mr. Dayan recommended that they base any such motion on the absence of a knowing and intelligent waiver, due to Davis's supposed low IQ and limited intelligence, rather than on a due process violation.  (Pet'r Ex. 17 (Suppression Memo) ¶ 3.)

Trial counsel had two practical reasons for not filing a motion to suppress on those grounds.  The first was that in order to show Davis was unable to knowingly and intelligently waive his *Miranda* rights, trial counsel would have had to put a mental health expert on the stand at the suppression hearing,[17] and they had only one, Dr. Noble.  Based upon their knowledge of the tactics and techniques of the prosecuting attorney assigned to the case, trial counsel were unwilling to give her a preview of their expert and his opinions before he appeared before the jury. (Pet'r Ex. 17 (Suppression Memo) ¶ 3.)  Additionally, counsel had no realistic expectations that the judge scheduled to preside over the trial would appoint an additional psychologist for the

---

[17]That also would have been the case had they attempted to suppress the statement on due process grounds.  Sergeant Shroat's testimony indicates that Davis was interviewed for approximately five hours (Sent. Tr. at 291) not an inordinately long time considering that he gave both an oral and written statement.  During that time, he was not under arrest.  He was offered frequent restroom breaks, as well as food and drink.  He accepted an offer of something to eat and drink only once, and there is no indication that he accepted a restroom break. There is no indication that he was handcuffed during any portion of his interrogation.  (Pet'r Ex. 10 (Investigative Follow-up Report).)  Outwardly, Davis's evidence does not indicate that the circumstances of the interrogation were unduly coercive.  As such, Davis would have had to present evidence of factors other than the circumstances of the interrogation in order to show that his confession was not voluntary.  The only evidence Davis has pointed to are the opinions of Dr. Noble and Seymour Halleck, a psychiatrist hired during post-conviction, that Davis's state of mind at the time he spoke to police, his low intellectual functioning, and his use of alcohol and drugs earlier in the evening rendered his statement involuntary.  (Pet'r Ex. 8 (Aff. of Jerry Noble) ¶ 9); (Pet'r Ex. 9 (Aff. of Seymour Halleck) ¶ 8.)

purpose of the suppression motion.  (Pet'r Ex. 17 (Suppression Memo) ¶ 3.)

Their second reason was that such a motion could be counterproductive.  Trial counsel believed that if they unsuccessfully sought to suppress Davis's confession on the grounds that his *Miranda* rights waiver was not knowing and intelligent, Judge Payne might prohibit them from then arguing to the jury that Davis made a voluntary, pre-arrest confession, indicating his early acceptance of responsibility and remorse.  (Pet'r Ex. 17 (Suppression Memo) ¶ 4.)[18]

Finally, counsel had reason to believe that Davis's waiver was knowing and intelligent. Counsel discussed the circumstances surrounding the confession with their client.  (Pet'r Ex. 17 (Suppression Memo) ¶¶ 2, 4.)  From their discussions with Davis, they got no indication that he was under the influence of a controlled substance when he spoke to police, even though they knew that he had smoked marijuana and had drunk alcohol earlier in the evening.  (Pet'r Ex. 17 (Suppression Memo) ¶ 2.)  Also from their discussions with Davis, they formed the opinion that Davis had understood his *Miranda* rights and that his waiver was knowing and intelligent.  (Pet'r Ex. 17 (Suppression Memo) ¶ 2.)  Notwithstanding Dr. Nobles' report that Davis's test results indicated an IQ in the borderline retarded range, Davis was on his way to graduating from high school without ever having repeated a grade and had been accepted to college.  At the time of

---

[18]Davis also points to a statement in Faye Burner's affidavit indicating that she and co-counsel also were concerned that if they moved to suppress the statement, the District Attorney "might be able to present information in front of the jury that [trial counsel] thought [Davis's] confession was involuntary or coerced, and not a product of his feelings of guilt, effectively rebutting our theme of early and deep remorse."  (Pet'r Ex. 15 (Aff. of Faye Burner) ¶ 9.)  Davis argues that to rely on such a belief was unreasonable because under state law, a judge's ruling on a pre-trial motion cannot be revealed to the jury.  The Court notes that if that indeed was a concern of Burner and Leslie, it was not enough of one to have warranted mention in their suppression memo, (Pet'r Ex. 17 (Suppression Memo)), which is a rather detailed account of their thinking at the time of trial.

trial, Burner had been a public defender for at least ten years and, therefore, was experienced in interviewing criminal defendants.[19]  It was not unreasonable for counsel to rely to some degree on their own perceptions of how well Davis, despite his supposed intellectual shortcomings, understood the conversations that he had with them about his case, including issues surrounding his confession.

As is evident from the foregoing, trial counsel investigated the feasibility and merits of filing a motion to suppress.  Contrary to Davis's assertions, counsel were well aware of their expert's opinion regarding the voluntariness of both the confession and the rights waiver, but they made a tactical decision not to file a motion to suppress.  They had several practical reasons for not filing a motion, as well as serious doubts about its success.  When making strategic trial decisions, it is not unreasonable for trial counsel to factor in their own knowledge of and experiences with the practices and predispositions of opposing counsel and the presiding judge.  Nor is it unreasonable to rely upon their own judgments as experienced trial attorneys.  The Court notes that Burner and Leslie's post-conviction affidavits do not indicate that they have learned something in post-conviction that would have changed their minds about filing a motion to suppress.  (Pet'r Ex. 15 (Aff. of Faye Burner)); (Pet'r Ex. 16 (Affidavit of William Leslie).)  For the foregoing reasons, the Court concludes that trial counsel's decision not to file a motion to suppress was a strategic one based upon an adequate investigation of the merits, potential negative consequences and likelihood of success.  *See Strickland*, 466 U.S. at 690 ("Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually

---

[19]The extent of Leslie's legal experience is not clear, but prior to representing Davis, he had tried one capital case as second chair.  (Pet'r Ex. 16 (Aff. of William Leslie) ¶ 4.)

unchallengeable.").

As for Davis's claim that counsel were ineffective for failing to inform him that "expert" attorneys had advised them to file a motion to suppress, the Court already has referred to the lack of evidentiary support for this claim. However, even if the facts as alleged by Davis are true, trial counsel had no duty to share that information with Davis. The decision whether to file a motion to suppress is a tactical decision given over to trial counsel, and consent of the client is not required. *See Sexton v. French*, 163 F.3d 874, 885 (4th Cir. 1998). The MAR court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law. *See* § 2254(d).

CLAIM VI: *IAC and Right to Testify*

Davis claims that counsel rendered ineffective assistance by failing to "fully" advise him of his right to testify. Specifically, Davis asserts that counsel did not warn him that the court might exclude evidence that Davis now believes was crucial to his mitigation defense. Additionally, counsel did not re-advise him of his right to testify after the judge excluded the aforementioned evidence. Davis claims that, as a result, his waiver of his right to testify was not knowing, voluntary, or intelligent.

Davis raised this claim in his MAR, and the State argues that the MAR court held that the claim was procedurally defaulted. However, as Davis notes, the MAR court's procedural default ruling applied only to a claim that the trial court erred in the manner in which it questioned Davis about his right to testify. (State Ex. E (Aug. 29, 2002 MAR Order) VI.) In his Reply in Support of his Petition for Writ of Habeas Corpus and Answer to the State's Motion to Dismiss, Davis

45

insists that in the instant claim, he is not alleging that the trial court erred in either the timing or manner in which it questioned him regarding his understanding of his right to testify. Instead, Davis insists that this claim is one of ineffective assistance of counsel only. As such, this Court will treat this claim as an IAC claim only. The MAR court denied Davis's IAC claim on the merits without holding an evidentiary hearing.

"[A] defendant in a criminal trial has a constitutional right to testify on his own behalf." *United States v. McMeans*, 927 F.2d 162, 163 (4th Cir.1992) (citing *Rock v. Arkansas*, 483 U.S. 44, 51, 107 S.Ct. 2704 (1987)). It is "the defendant who retains the ultimate authority to decide whether or not to testify." *Id.* (citing *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308 (1983)). It is counsel's duty to inform the defendant of his right to testify and to discuss with him the implications of testifying versus not testifying. *See United States v. Teague*, 953 F.2d 1525, 1534 (11th Cir. 1992). Because counsel's duty to his client is implicated, claims that counsel interfered with or impeded a defendant's right to testify must satisfy the two-prong test established in *Strickland v. Washington*. *See Sexton*, 163 F.3d at 882.

It is undisputed that counsel and Davis discussed his right to testify and whether he should testify. (Sent. Tr. 1191); (Pet'r Ex. 20 (Aff. of Phillip Davis) ¶ 9.) It also is undisputed that counsel advised Davis not to testify. (Pet'r Ex. 15 (Aff. of Faye Burner) ¶ 14); (Pet'r Ex. 20 (Aff. of Phillip Davis).) Finally, it is undisputed that Davis waived his right to testify.

Davis does not claim that counsel were ineffective for advising him not to testify. Instead, his claim is that counsel failed to provide him with critical information that would have affected his decision not to testify. Specifically, he asserts that counsel failed to tell him that the letters

that he wrote to his mother while awaiting trial were the "best evidence" that the defense had of his remorse. Additionally, he asserts that counsel failed to warn him that the trial court might not let the jury see those letters. Finally, he claims that counsel were ineffective for failing to re-advise him of his right to testify after the trial court excluded the letters. Therefore, Davis claims, his waiver of his right to testify was not knowing and intelligent.

To prevail on this claim Davis first must show "that counsel's performance was deficient," meaning that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Second, he must show "that the deficient performance prejudiced the defense." *Id*.

As noted previously, Davis's mother, Phyllis Davis, was the first witness for the defense, and it was through her that trial counsel attempted to introduce the letters Davis had written while awaiting trial. At the conclusion of Ms. Davis's testimony, the judge denied counsel's motion to admit the letters, albeit indicating that he might be willing to revisit the issue. (Sent. Tr. 641.) Two days later, on April 18, 1997, the trial court conducted an on-the-record colloquy with Davis regarding whether he had discussed his right to testify with his counsel and whether he understood his right to testify. (Sent. Tr. 1191.) Davis informed the judge that he and his attorneys had discussed his right to testify and that he understood that he had the right to testify. (Sent. Tr. 1191.) Subsequent to the aforementioned colloquy, the trial court excluded the letters Davis had written to his mother on the grounds that they were unreliable and that their admission to prove remorse would be cumulative of the evidence of remorse already before the jury. (Sent. Tr. 1192-93.) Trial counsel did not re-advise Davis of his right to testify after the trial court excluded the letters. (Pet'r Ex. 20 (Aff. of Phillip Davis) ¶ 12.) Prior to resting their case-in-chief, the defense

filed a motion asking the court to allow Davis to make an unsworn allocution to the jury. (State Ex. 3 (R. on Appeal) 63-64); (Sent. Tr. 1195-97.) The court denied the motion.

As an initial matter, Davis presents two conflicting arguments. The first is that had he known that the letters might be excluded, he would not have waived his right to testify. The second is that had counsel re-advised him of his right to testify after the trial court excluded the letters, he would not have waived his right to testify. The first argument implies that Davis waived his right to testify before the trial court excluded the letters. That is not the case. The trial court excluded the letters after its colloquy with Davis regarding his understanding of his right to testify. (Sent. Tr. 1191.) Davis did not waive his right to testify until his defense rested. As such, Davis was not prejudiced by counsel's failure to warn him that the letters might be excluded because he did not waive his right to testify until after the letters had been excluded.

Similarly, by the time Davis waived his right to testify, he knew that trial counsel considered the letters to be their "best evidence" of remorse because he heard counsel argue to the trial court that the letters were the "best evidence of [Davis's] expression." (Sent. Tr. 1194.) Counsel were not deficient for failing to tell Davis this themselves. As Davis acknowledges, prior to the sentencing hearing, counsel discussed trial strategy with him. (Pet'r Ex. 17 (Suppression Memo) ¶ 5); (Pet'r Ex. 20 (Aff. of Phillip Davis) ¶¶ 3-4.) They discussed their belief that the best way to save Davis's life was to show that he was remorseful for the killings. (Pet'r Ex. 17 (Suppression Memo) ¶ 5); (Pet'r Ex. 20 (Aff. of Phillip Davis) ¶¶ 3-4.) Although Davis asserts that counsel did not tell him what evidence they intended to offer to show his remorse, he knew that the letters he wrote his mother were important evidence of his remorse and that his attorneys intended to use them. (Pet'r Ex. 20 (Aff. of Phillip Davis) ¶¶ 7-8.) Davis also knew that

counsel's strategy of showing remorse did not include Davis taking the stand and testifying. (Pet'r Ex. 20 (Aff. of Phillip Davis) ¶ 8.)  Davis does not cite, and this Court is unaware of any supporting case law requiring an attorney to lay before a defendant all of the evidence he intends to present and rank it by relative importance.  Even if counsel erred in not discussing with Davis the relative importance of each piece of evidence they intended to offer, the error was not "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

Finally, Davis argues that his waiver of his right to testify was not knowing and intelligent because after the trial court excluded the letters: (1) "trial counsel did not advise [him]of how and to what extent this exclusion affected the strategy underlying his decision to waive his right to testify" (Pet. ¶ 163), and (2) "trial counsel did not consult with [him] to ensure that he understood that he still had the right to testify and express his remorse at the sentencing hearing" (Pet. ¶ 164). With regard to the first argument, the record shows that exclusion of the letters did not affect trial counsel's strategy or their views on whether Davis should testify.  After the judge excluded the letters, trial counsel could have called Davis to testify.  Instead, they made a motion to allow Davis to give an unsworn allocution before the jury so that he could express his remorse directly. Clearly, counsel did not want Davis to take the stand.  In fact, in their post-conviction affidavits, his trial attorneys state that their views regarding whether Davis should testify did not change. (Pet'r Ex. 15 (Aff. of Faye Burner) ¶ 14); (Pet'r Ex. 16 (Aff. of William Leslie) ¶ 14.)  As such, they had no reason to revisit the issue with him.  Davis has not cited, and this Court is unaware of, any case holding that, in the absence of a change in strategy, an attorney has a continuing obligation to periodically remind a defendant of his right to testify.

As for the second argument, Davis fails to provide any evidence that he did not understand that he still had the right to testify after the judge excluded the letters. In fact, he does not even make that assertion in his affidavit, much less the instant Petition. Indeed, he makes no rational connection between the court's exclusion of the letters and his understanding of his right to testify.

It appears that Davis now believes that his trial counsel should have advised him to testify after the trial court excluded the letters. (Pet'r Ex. 20 (Aff. of Phillip Davis) ¶¶ 8, 12-13.) However, in the instant Petition, Davis does not attack counsel's advice head on. *See generally Carter v. Lee*, 283 F.3d 240, 249 (4th Cir. 2002) ("[T]he advice provided by a criminal defense lawyer on whether his client should testify is 'a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance.'") (quoting *Hutchens v. Garrison*, 724 F.2d 1425, 1436 (4th Cir. 1983)). Instead, he has taken a backdoor approach by arguing that counsel were ineffective for failing to provide him with adequate information to enable him to make a knowing and intelligent waiver of his right to testify. As such, the Court is called on only to review the adequacy of counsel's communications with Davis and not the merits of their strategy. For the reasons outlined above, trial counsel's conduct falls well within "the wide range of professionally competent performance" expected of counsel. *Griffin v. Warden*, 970 F.2d 1355, 1357 (4th Cir. 1992). The MAR court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law. *See* § 2254(d).

CLAIM VII: *Trial Court's Handling of Right to Testify*

Near the end of the sentencing trial but before the defense rested, the trial court addressed

Davis regarding whether his counsel had informed him of his right to testify.  After confirming

with Davis that he and counsel had discussed his right to testify, the court said the following:

> COURT:        You understand you have the right to testify, and if you do testify,
>               that you'll be subject to being cross-examined on a variety of
>               subject matters limited only by my discretion of what's relevant.
>               Do you understand that?
>
> DEFENDANT:        Yes, sir.

(Sent. Tr. 1191.)  Davis asserts that the judge's instruction that cross-examination would be

limited only by the judge's discretion of what was relevant was erroneous because it did not

inform Davis of the other factors that would effect cross-examination, such as general rules of

relevancy, competency and privilege, Confrontation Clause considerations, the requirements of

good faith, and other courtroom rules and practices.  Davis argues that he was unconstitutionally

deterred from testifying by this alleged misstatement of law.  The North Carolina Supreme Court

rejected this claim on the merits.

Under North Carolina law, "the bounds of cross-examination are limited by two general

principles: 1) the scope of cross-examination rests within the sound discretion of the trial judge;

and 2) the questions must be asked in good faith."  *State v. (James) Davis*, 506 S.E.2d 455, 471

(N.C. 1998).  The state appellate court held that the trial court properly instructed Davis regarding

the scope of cross-examination in a North Carolina court.  *See Davis*, 539 S.E.2d at 271.

A state court's decision on a question of state law is not subject to review by a federal

habeas court.  *See Roach v. Angelone*, 176 F.3d 210, 217 (4th Cir. 1999).  Therefore, the North

Carolina appellate court's conclusion that the trial court properly instructed Davis regarding the

scope of cross-examination is not subject to review by this Court. *See Estelle v. McGuire*, 502 U.S. 62, 68, 112 S.Ct. 475 (1991).

Davis's claim is that he was deprived of his right to testify because the instruction by the judge was erroneous. In light of the state court's conclusion that the instruction was not erroneous, Davis has no constitutional claim. The state appellate court's conclusion that because the trial court's instruction was not erroneous, it did not impermissibly chill defendant's right to testify was not contrary to or an unreasonable application of clearly established federal law.

CLAIM VIII: *Ineffective Assistance of Trial and Appellate Counsel for Failing to Challenge Prosecutors' Closing Arguments*

Davis claims that trial counsel were ineffective for failing to object to allegedly improper comments made by prosecutors during their closing arguments. Davis also claims that appellate counsel were ineffective for failing to raise claims of prosecutorial misconduct on direct appeal. The State asserts that Davis's claim that trial counsel were ineffective is procedurally defaulted.

*Ineffective Assistance of Trial Counsel*

Ordinarily a federal habeas court will not review a claim that is procedurally defaulted, absent a showing of cause and prejudice or a fundamental miscarriage of justice to excuse the procedural default. *See Fisher v. Angelone*, 163 F.3d 835, 844 (4th Cir. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 731-32, 111 S.Ct. 2546 (1991) (holding that a claim dismissed on a state procedural rule is procedurally barred on federal habeas review). Generally, a claim will be defaulted if a state court has expressly found that review is barred by an adequate and independent state procedural rule. *See Ashe v. Styles*, 39 F.3d 80, 85 (4th Cir. 1994). "A state rule is adequate if it is 'firmly established,' and regularly and consistently applied by the state court." *McCarver v.*

*Lee*, 221 F.3d 583, 588 (4th Cir. 2000) (internal citations omitted). A state procedural rule is independent if it does not "depend[] on a federal constitutional ruling." *See Burket v. Angelone*, 208 F.3d 172, 183 (4th Cir. 2000) (citing *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S.Ct. 1981 (1988)).

The MAR court held that Davis's claims that trial counsel were ineffective for failing to object to portions of the prosecutors' closing arguments were procedurally barred because they could have been brought on direct appeal but were not. *See* N.C. Gen. Stat. § 1419(a)(3). Section 15A-1419(a)(3) generally bars collateral review in the State courts of claims that could have been brought on direct appeal but were not. The Fourth Circuit has recognized that § 15A-1419(a)(3) generally is an independent and adequate state procedural bar. *See McCarver*, 221 F.3d at 589. However, where § 15A-1419(a)(3) has not been consistently and regularly applied by the state court to a particular type of federal constitutional claim, it cannot be considered an adequate state law ground barring federal court review of the merits of that claim. *See Brown v. Lee*, 319 F.3d 162, 170 (4th Cir. 2003).

In his Responses to the State's Motion to Dismiss and Motion for Summary Judgment, Davis argues that § 15A-1419(a)(3) is not regularly and consistently applied to IAC claims. However, that argument does not address the question at issue here, which is whether MAR courts regularly and consistently apply § 15A-1419(a)(3) to IAC claims *that could have been raised on direct appeal* but were not. *See McCarver*, 221 F.3d at 589 (explaining that the relevant inquiry concerns the procedural posture of the defaulted claim). The Fourth Circuit has recognized that North Carolina courts have applied § 15A-1419(a)(3) to bar IAC claims that could have been brought on direct review but were not. *See McCarver*, 221 F.3d at 589 ("[W]e reject McCarver's

attempt to treat ineffective assistance claims as categorically different from other kinds of claims that can be barred under section 15A-1419(a)(3).").  In order to demonstrate that § 15A-1419(a)(3) is not consistently and regularly applied to IAC claims that could have been brought on direct review, Davis would need to cite a "non-negligible number of cases" in which an IAC claim could have been brought on direct review but was not, and in which the collateral review court nonetheless failed to bar the claim under § 15A-1419(a)(3) because it was an IAC claim.  *See Reid v. True*, 349 F.3d 788, 805 (4th Cir. 2003) (quoting *McCarver*, 221 F.3d at 589).

Davis has provided this Court with copies of six Orders dispensing with Motions for Appropriate Relief.  (Pet'r Resp. to State's Mot. to Dismiss Exs. A-F.)  In each of those Orders, the State Superior Court considering the Motion conducted a merits review of at least one IAC claim.  However, only one of those Orders supports Davis's argument that collateral review courts do not consistently and regularly bar IAC claims that could have been brought on direct review but were not.

In *State v. Hardy*, 97 CRS 10813-14 (Mecklenburg County Sup. Ct., Dec. 1, 2005), *State v. Roper*, No. 87-CRS-4488, 4496, 4497 and 5932 (Burke Co. Sup. Ct., Aug. 29, 1995); *State v. McNeil*, No. 83 CRS 25605 (Wake County Sup. Ct., Aug. 26, 1993); *State v. Robbins*, No. 82-CRS-13883 (Durham Co. Sup. Ct., Feb. 1, 1993); and *State v. Spruill*, No. 84 CRS 1423 (Northampton County Sup. Ct., Feb. 21, 1992), the MAR courts addressed the defendants' IAC claims on the merits.  (Pet'r Resp. to State's Mot. to Dismiss Exs. A, C-F.)  However, those IAC claims could not have been brought on direct review because they involved matters that were not apparent from the record on appeal or from trial and sentencing transcripts.  *See State v. Fair*, 557 S.E.2d 500, 525 (N.C. 2001) (noting that many IAC claims cannot be developed on direct appeal).

As such, they were not subject to procedural default under § 15A-1419(a)(3). Consequently, these cases do not provide evidence that state collateral review courts do not consistently and regularly apply § 15A-1419(a)(3) to procedurally bar IAC claims that could have been brought on direct review but were not.

Only *State v. Brown*, 84 CRS 6485 (Robeson County Sup. Ct., June 30, 1997), supports the argument that § 15A-1419(a)(3) is not consistently applied. (Pet'r Resp. to State's Mot. to Dismiss Ex. B.) In *Brown*, the MAR court did not procedurally bar any of the IAC claims despite the fact that a number alleged errors that were readily apparent from the record on appeal, and, as such, could have been raised on direct review. *See Fair*, 557 S.E.2d at 525 ("[D]efendants should necessarily raise those IAC claims on direct appeal that are apparent from the record."). Nevertheless, this single decision cannot support a determination that § 15A-1419(a)(3) has been applied inconsistently by MAR courts confronted with IAC claims that could have been brought on direct appeal but were not. "[C]onsistent or regular application of a state rule of procedural default does not require that the state court show an undeviating adherence to such rule admitting of no exception," so long as the rule has "as a general rule, . . . been applied in the vast majority of cases." *Mueller v. Angelone*, 181 F.3d 557, 584 (4th Cir. 1999) (internal quotations and citation omitted).

Davis has failed to show that § 15A-1419(a)(3) is not an independent and adequate procedural bar to IAC claims in post-conviction that could have been raised on direct review but were not. Furthermore, Davis has failed to demonstrate cause and prejudice or that a fundamental miscarriage of justice would occur to excuse his failure to raise these claims on direct appeal. *See Wainwright v. Sykes*, 433 U.S. 72, 82, 97 S.Ct. 2497 (1977). Therefore, Davis's ineffective

assistance of trial counsel claims are procedurally defaulted.  *See id*.; *Fisher*, 163 F.3d at 844.

*Ineffective Assistance of Appellate Counsel*

Davis claims that appellate counsel were ineffective for failing to raise claims on direct appeal that the prosecutors made improper arguments to the jury at closing.  The MAR court rejected these claims on the merits, concluding that the prosecutors' comments, if improper at all, were not so grossly improper as to prejudice Davis.

The right to effective assistance of counsel extends to criminal defendants on their first appeal of right, and the same standards apply to counsel at trial and on appeal.  *See Evitts v. Lucey*, 469 U.S. 387, 396, 105 S.Ct. 830 (1985).  In order to prove that he has been denied his Sixth Amendment right to effective assistance of appellate counsel, Davis must satisfy the two-prong test set forth in *Strickland v. Washington*.  466 U.S. at 688-89.  First, Davis must show that his counsel were objectively unreasonable in failing to identify and argue on direct appeal the instances of alleged prosecutorial misconduct discussed *infra*.  *See Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746 (2000) (citation omitted).  Second, he must show that but for his attorneys' deficient performance, there is a reasonable probability that he would have prevailed on his appeal.  *See id*. (citation omitted).

When a defendant fails to timely object at trial to a prosecutor's closing argument but attempts to challenge the argument on appeal, the North Carolina appellate courts review the record to determine whether the remarks were so grossly improper that the trial court abused its discretion by failing to intervene *ex mero motu*.  *See State v. Trull*, 509 S.E.2d 178, 193 (N.C. 1998).  Therefore, in order to prevail under the prejudice prong of *Strickland*, Davis must show

that had counsel challenged the prosecutors' arguments on direct appeal, there is a reasonable probability that the appellate court would have held that the arguments were so grossly improper that the trial court abused its discretion by failing to intervene *ex mero motu*. To establish such a level of impropriety, Davis must show that the prosecutors' comments "so infected the trial with unfairness that they rendered the conviction fundamentally unfair." *(James) Davis*, 506 S.E.2d at 467.

### A. References to Evidence Outside the Record

In this portion of his claim, Davis points to a prosecutor's reference to a statement that Davis allegedly made to his girlfriend after the murders. Early in his closing argument and in reference to the murder of Caroline, the prosecutor made the following remarks:

> 'I've done this, so what am I going to do? Well, I'm going to disturb the house,' as he told Niconda Briscoe, and you heard that statement come into evidence because somebody had read it. And they said, 'Yes, I remember. He told her that. He wanted to make it look like he didn't do it.'

(Sent. Tr. 1297-98.) The girlfriend, Niconda Briscoe, did not testify, and there was no testimony from any witness regarding anything Davis allegedly said to Briscoe. The prosecutor only referred to the alleged statement once but argued several times to the jury that the evidence showed that Davis planned the armed robbery and murders and then tried to cover them up.

Davis argues that he was prejudiced by the injection of this extra-record evidence into the prosecutor's argument because it undercut the defense theory of remorse by implying that he coldly calculated how to hide his conduct. Davis also argues that the prosecutor used the alleged statement to emphasize the premeditated and deliberate nature of the killing of Joyce Miller and

the aggravating factor that the murder of Joyce Miller was committed while Davis was engaged in the commission of an armed robbery. Finally, Davis agues that the prosecutor used the statement to argue that the jury should not find the statutory mitigating circumstance that Davis's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. *See* N.C. Gen. Stat. § 15A-2000(f)(6). Davis claims that appellate counsel were ineffective for failing to challenge the prosecutor's reference to evidence not in the record.

Under North Carolina law, the prosecutor is entitled to argue to the jury "the law and the facts in evidence and all reasonable inferences to be drawn therefrom." *State v. Monk*, 212 S.E.2d 125, 131 (N.C. 1975) (citations omitted); *see also U.S. v. Wilson*, 135 F.3d 291, 298 (4th Cir. 1998) ("[A] prosecutor may argue that the evidence gives rise to an inference, but the suggested inference must be reasonably drawn from the facts in evidence.") (citation omitted). However, the prosecutor may not "'travel outside the record' and inject into his arguments facts of his own knowledge or other facts not included in the evidence." *State v. Noell*, 202 S.E.2d 750, 766 (N.C. 1974), *sentence vacated on other grounds by Noell v. North Carolina*, 428 U.S. 902, 96 S.Ct. 3203 (1976) (citations omitted).

Notwithstanding the prosecutor's improper reference to extra-record evidence, Davis cannot show sufficient prejudice to warrant relief. The evidence introduced at trial showed that after he shot his cousin and shot and bludgeoned his aunt, Davis changed out of his bloody clothes and put them, along with the meat cleaver, in a garbage bag. He then took VCRs, a truck, two purses, checks, and credit cards belonging to the victims. He drove himself to the Asheville Mall in his aunt's stolen truck and went on a shopping spree financed by the credit cards that he had stolen from her. After leaving the Asheville Mall, he disposed of the bloody clothes, meat

cleaver, VCRs, and a purse in one location. He drove himself to a second location where he disposed of a purse, the gun and the truck. He then took a cab to a third location where he disposed of the stolen credit cards and the keys to the truck. Evidence from the crime scene showed that Joyce and Caroline's bedrooms appeared to be ransacked. Finally, prior to finally confessing to the murders, Davis told police multiple versions of the events surrounding the murders and robbery, all of which blamed others for the crimes.

From the foregoing evidence, a jury reasonably could infer that Davis had disturbed the Miller home and had taken items of personal property to make it appear as if someone else had committed the armed robbery and murders. As such, the prosecutor's reference to a statement allegedly made by Davis to his girlfriend, did not "so infect[ ]the trial with unfairness" that the trial court abused its discretion by failing to intervene *ex mero motu*. *See (James) Davis*, 506 S.E.2d at 467.

### B.  Comments on Davis's Exercise of his Fifth Amendment Rights

Davis asserts that in arguing to the jury that there was no evidence of remorse, the prosecutor drew attention to the fact that Davis had not taken the stand. Davis argues further that references to Davis's demeanor in the courtroom highlighted the fact that he had not taken the stand to talk to the jury. He claims that appellate counsel were ineffective for failing to challenge the prosecutor's arguments on direct appeal.

A prosecutor improperly comments on the defendant's failure to testify when "the language used [is] manifestly intended to be, or . . . [is] of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United*

*States v. Anderson*, 481 F.2d 685, 701 (4th Cir. 1973), *aff'd*, 417 U.S. 211, 94 S.Ct. 2253 (1974).

During closing, the prosecutor argued:

> He made a conscious choice to commit two acts of cold-blooded, brutal and senseless, premeditated murder. That's why we're here. He thought about it, he planned it, he did it and he doesn't care.
>
> Now, his mother said he's remorseful. *Not one witness has come to this stand other than to give you some platitude,* "Yes, I believe he's remorseful." *He hasn't talked about it to anybody.* A bunch of these witnesses said, "Well, we don't really talk about it. He hasn't said much about it, but I know he's remorseful." Ladies and gentlemen, remorse, *you're on your knees crying out and begging and reflecting on what you've done,* not eating honey buns and fussing whether they're stale and gaining fifteen to twenty pounds. Three hundred and some drinks, three hundred and some candy bars, six hundred and some cookies and snacks, three hundred and some Doritos and popcorn and cheese chips. Remorse? Ladies and gentlemen, there's no remorse in this case. *The tears, I submit to you, that this defendant's cried are for himself because he got caught, because he knows what's going to happen to him.* . . .

(Sent. Tr. 1311-1312) (emphasis supplied by Davis.)

The MAR court found that the prosecutor's argument that there was no evidence of remorse in this case was not a comment on Davis's exercise of his right not to testify. This Court agrees. The prosecutor never commented directly or indirectly on Davis's failure to testify. Instead, he argued that defense witness testimony that Davis was remorseful was undermined by Davis's actions prior to trial, which, the prosecutor argued, were not consistent with remorse.

Additionally, the prosecutor's reference to Davis's demeanor during the trial was well within the bounds of acceptable argument. The Fourth Circuit has found that comments about the lack of remorse demonstrated by a defendant's courtroom demeanor do not violate a defendant's Fifth Amendment rights. *See Bates v. Lee*, 308 F.3d 411, 421 (4th Cir. 2002) (citations omitted). In the instant case, the prosecutor's argument that Davis's tears at trial were for himself and not

the victims was not a comment on Davis's failure to testify.

        *C.  Knowing Use of False Evidence and Opportunistic Exploitation of the Exclusion of Evidence to Create a False Impression*

Davis asserts that the prosecutor presented false evidence to the jury when he argued that there was no evidence of remorse in the case because Davis "[h]asn't talked about it to anyone" (Sent. Tr. 1311). Davis asserts further that the prosecutor exploited the trial court's exclusion of Davis's letters to his mother to create a false impression that Davis had not expressed his remorse to anyone. Davis claims that appellate counsel were ineffective for failing to challenge on appeal the prosecutor's knowing use of false evidence and the prosecutor's "opportunistic exploitation of the exclusion of evidence to create a false impression" before the jury.

In *Napue v. Illinois*, the Supreme Court held that a "State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." 360 U.S. 264, 269, 79 S.Ct. 1173 (1959). During his closing argument, the prosecutor made the following remarks:

> Now, his mother said he's remorseful. *Not one witness has come to this stand* other than to give you some platitude, "Yes, I believe he's remorseful." *He hasn't talked about it to anybody*. A bunch of these witnesses said, "Well, we don't really talk about it. He hasn't said much about it, but I know he's remorseful."

(Sent. Tr. 1311-12) (emphasis supplied by Davis.)

Davis has not alleged that any witness testified falsely. While he has alleged that the State knowingly introduced false evidence by arguing that Davis had not talked to anyone about his remorse, the Court finds that a prosecutor's argument is neither testimony nor evidence under the common usage and understanding of those terms. As such, there is no factual basis to support Davis's allegation that the prosecutor knowingly used false evidence. Consequently, appellate

counsel could not have been ineffective for failing to raise such a claim on direct appeal.

Davis also asserts that the prosecutor created a false impression before the jury when he argued that Davis had never talked about his remorse to anyone. Davis argues, correctly, that the prosecutor knew that Davis had expressed his remorse in letters that he had written to his mother. (Pet'r Ex. 7 (Def.'s Trial Exs. 16, 18, 21).) However, Davis's argument overlooks the fact that several defense witnesses offered more than mere "platitudes" and testified that Davis had expressed his remorse directly to them. Davis's brother, Patrick, testified that Davis cried whenever the two spoke about the murders and that Davis had told Patrick that he was sorry for what he had done. (Sent. Tr. 1101-02.) Davis's aunt, Marion Mays, testified that Davis had sent her two letters in which he had asked her and the rest of the family to forgive him for what he had done. (Sent. Tr. 1149-50.) And, Richard Green, Davis's former principal, testified that Davis had told him that he was sorry for what he had done. (Sent. Tr. 1186.)

Notwithstanding the prosecutor's mischaracterization of the evidence at trial, Davis still cannot show that the isolated remark at issue here "so infected the trial with unfairness as to make the resulting [sentence] a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868 (1974). The trial judge instructed the jurors that they were to be guided by their own recollections of the evidence, even if those recollections conflicted with an attorney's summation of the evidence during closing arguments. (Sent. Tr. 1274, 1426.) Except in extraordinary circumstances, jurors are assumed to follow a court's instructions. *See Richardson v. Marsh*, 481 U.S. 200, 206, 107 S.Ct. 1702 (1987) (citations omitted). As such, this Court must assume that the jurors were guided by their own recollections of the witnesses' testimony and not the prosecutor's mischaracterization. The prosecutor's comments did not "so infect[ ]the trial

with unfairness" that the trial court abused its discretion by failing to intervene *ex mero motu*.  *See (James) Davis*, 506 S.E.2d at 467.

### D.  Name-Calling, Statements of Bias, and Attacks on the Defense Expert

#### i.  Name-Calling

Davis asserts that the prosecution exceeded the bounds of proper argument by referring to him as "the most diabolical force in the planet . . . loose in Buncombe County . . ." and by arguing that he was a "plague on society . . . and should be removed."  Trial counsel objected to both arguments.  Davis claims that appellate counsel were ineffective for failing to challenge the prosecutor's arguments on direct appeal.

Personal attacks on a defendant are improper.  However, a full reading of the prosecutor's argument shows that Davis has taken the reference to "the most diabolical force in the planet" out of context.  The prosecutor's complete remarks are as follows:

> And while we're on the subject of labeling, this is not a tragedy.  I'm the prosecutor.  This is not a tragedy.  Earthquakes are tragedies.  No matter how many defense attorneys parade in front of juries and say it's a terrible tragedy, it's horrible and we've pled guilty to it, the most diabolical force in the planet was loose in Buncombe County, and this is the malignant evil visited on these people by that defendant.
> . . . .
> It's the deliberate conduct of a human being.  It's choice and it's behavior.

(Sent. Tr. 1286.)  The "most diabolical force in the planet" was not a direct reference to Davis.  The prosecutor was disputing the defense's characterization of the murders as "tragedies" by arguing that Caroline and Joyce Miller did not die because a tragedy struck but because of the deliberate actions of the defendant, which she characterized as "evil."

Characterizing Davis's actions as "evil" was not outside the bounds of proper argument any more than characterizing his actions as "malicious," "ruthless," or "vicious" would have been. The Court notes that one of the aggravating factors the prosecution was attempting to prove was that the murder of Joyce Miller was "especially heinous, atrocious or cruel."  A portion of the instruction given to the jury on that aggravating factor explains that, "heinous means extremely wicked or shockingly *evil*."  (Sent. Tr. 1385.)

Calling Davis "a plague on society," also was not an improper personal attack *per se*.  *See Dunn v. Smith*, No. 94-5091, 1994 WL 706741, at *6 (6th Cir. Dec. 19, 1994) (unpublished). However, even assuming *arguendo* that the comment was improper, Davis still cannot succeed on this claim.  The fact that a prosecutor's comments were "undesirable or even universally condemned" is not sufficient to overturn a conviction.  *See Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464 (1986).  Instead, the reviewing court must determine whether the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id*. (quoting *Donnelly*, 416 U.S. at 643).  This determination requires the reviewing court to look at "the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the judge's charge, and whether the errors were isolated or repeated."  *Boyd v. French*, 147 F.3d 319, 329 (4th Cir.1998) (quoting *Bennett v. Angelone*, 92 F.3d 1336, 1345-46 (4th Cir. 1996) (internal quotation marks omitted).

In this case, the comment appeared once in the prosecutor's 37-page argument.  It was made after the prosecutor had discussed each of the mitigating and aggravating circumstances and as he was beginning to argue why the jury should impose the death penalty rather than a life sentence.  One of his arguments was that Davis was a future danger to those around him.

The evidence in aggravation in this case was overwhelming, and the prosecutor elicited compelling testimony regarding Davis's potential for future dangerousness, including from Davis's own mental health expert. The murder of Joyce was gruesome, and Davis's actions in the hours afterward appeared calculating and cold-blooded. In light of the foregoing, the prosecutor's isolated reference to Davis as a "plague on society" did not so infect the trial with unfairness as to make the resulting sentence a denial of due process. *See Donnelly*, 416 U.S. at 643.

### ii. Expressions of Personal Bias

Davis asserts that the prosecutor's argument was improper when she acknowledged to the jury that she and the state's primary law enforcement witness were biased against the defendant. Davis takes issue with the following portion of the prosecutor's argument:

> [T]here's the story about the adulteress brought before Jesus by the crowd, and they were planning to stone her. And Jesus didn't say, "Don't stone her." He told them, "He who is without sin cast the first stone." And that, ladies and gentlemen, is the difference between justice and vengeance. If I cast that stone, that's vengeance, *because I am biased*. If Sergeant Shroat would have put a bullet in his head that night, that is vengeance, and he is not privileged to cast that stone *because he is biased*. The jury swore an oath and you all promised that you wouldn't be biased, that you would hear the evidence, that you'd decide in accordance with the law, and sitting as a body under those circumstances with those promises you are sinless and you may cast that stone, and cast it you must.

(Sent. Tr.1293-94) (emphasis supplied by Davis.) Davis claims that appellate counsel were ineffective for failing to raise a claim on direct appeal that he was prejudiced by the prosecution's admission to the jury that she and one of her witnesses lacked objectivity.

The prosecutor's point was that determining the fate of the accused is not left in the hands of the State because the State, in pursuing a prosecution or sentence is biased in favor of a

conviction or particular sentence. The jury, on the other hand, was sworn to be unbiased and, therefore, was responsible for deciding which punishment was just. While the prosecutor's reference to Sergeant Shroat was overly-dramatic, Davis could not have been prejudiced by the prosecutor calling her own witness biased because it implied to the jury – whether she intended it to or not – that the witness did not testify from a disinterested, objective position but as one who had an interest in a particular outcome. For the foregoing reasons, the prosecutor's comments did not "so infect[ ]the trial with unfairness" that the trial court abused its discretion by failing to intervene *ex mero motu*. *See (James) Davis*, 506 S.E.2d at 467.

### iii. Attacks on Defense Expert

Davis asserts that the prosecutor improperly attacked the credibility and expertise of his mental health expert, Dr. Jerry Noble. Davis claims that appellate counsel were ineffective for failing to raise a claim on appeal challenging the prosecutor's argument.

While it is improper to make personal attacks on a witness, it is acceptable for a prosecutor to argue that a witness, even one accepted by the court as an expert, is not credible or is biased. Likewise, it is acceptable for the prosecutor to point to what the State considers to be evidence of bias, including that the expert is paid for his services and that the expert tends to be hired only by or predominantly by defendants.

While the prosecutor may have walked close to the line of impropriety by stating that, "[i]f you believe in psychology, you've got a good friend, Jerry Noble here," it was within the bounds of acceptable argument for the prosecution to point to what could be construed as evasiveness on Dr. Noble's part when questioned about production of his written report. In this case, there was

some evidence before the jury indicating that Dr. Noble delayed preparing a written report of his evaluations and findings until a few days before trial. (Sent. Tr. 1004-05.) For the foregoing reasons, the prosecutor's comments did not "so infect[ ] the trial with unfairness" that the trial court abused its discretion by failing to intervene *ex mero motu*. *See (James) Davis*, 506 S.E.2d at 467.

Because Davis would not have succeeded on direct appeal on any of the allegations raised in sub-claims A-D, appellate counsel was not ineffective for failing to raise them. *See, e.g.*, *A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004) ("If there was no underlying constitutional violation, a motion to suppress would have been futile and counsel could not be viewed as ineffective for failing to present such a motion."); *United States v. Carter*, 355 F.3d 920, 924 (6th Cir.2004) (counsel was not ineffective for failing to file motion where there was no reasonable probability that motion would be granted). The MAR court's rejection of Davis's ineffective assistance of appellate counsel claim was neither contrary to nor an unreasonable application of clearly established federal law. *See* § 2254(d)(1).

CLAIM IX: *Improper Closing Arguments*

Davis claims that his due process rights to a fundamentally fair sentencing hearing under the Eighth and Fourteenth Amendments were violated when the trial court allowed prosecutors to make several improper arguments during their closing arguments at the capital sentencing hearing. Specifically, Davis asserts that prosecutors improperly: a) commented on Davis's decision not testify; b) argued that the Bible endorsed the death penalty; c) misstated the law; and d) traveled outside the evidentiary record. Alternatively, Davis claims that to the extent that trial counsel

failed to object to these arguments, they rendered constitutionally ineffective assistance at trial. Davis raised the substantive claims on direct appeal to the North Carolina Supreme Court. To the extent that he raised them, Davis's IAC claims appear in his MAR.

### A. Davis's Right to Testify

Davis claims that the following argument was an unconstitutional indirect comment on his decision not to testify at his sentencing hearing:

| | |
|---|---|
| MS. DREHER: | Now, he sits here like this, and I know that it's hard for you to picture him doing what you know he did and what he's pled "guilty" to doing, and it's especially hard because he grows his hair out and then he tips his head down. |
| MS. BURNER: | Objection. |
| COURT: | Overruled. |
| MS DREHER: | And then he looks up and he looks pitiful and you can look at him. This is a huge, momentous decision you're going to make, and you shouldn't have to sneak a glance to see whether he's bawling or rolling his eyes or saying "did not" while a witness is testifying that he slammed a door and said, "F_ _ _ you" to a jailor. "F_ _ _ you, man." That's the real Phillip Davis when he's not in front of the jury. The stuff you saw in the case is the real Phillip Davis when he's not in front of a jury. |

(Sent. Tr. 1275.) Davis argues that by pointing out what he did in the courtroom – made it hard for the jury to see him, cried, rolled his eyes, and muttered – the State called attention to the fact that he did not testify.

As noted in a previous claim, a prosecutor improperly comments on the defendant's failure to testify when "the language used [is] manifestly intended to be, or . . . [is] of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to

testify." *United States v. Anderson*, 481 F.2d 685, 701 (4th Cir. 1973).  A complete reading of the prosecutor's argument shows that she was warning the jury not to be taken in by Davis's courtroom mannerisms but to remember testimony about how he behaved when he was not in front of a jury.  This Court is unaware of, and Davis fails to point to, any clearly established federal law prohibiting a prosecutor from drawing the jury's attention to a defendant's demeanor or behavior in the courtroom.  *See, e.g., Wainwright v. Greenfield*, 474 U.S. 284, 295 n.13, 284 S.Ct. 634 (1986) (suggesting that prosecutor may legitimately inquire into and comment upon defendant's demeanor and behavior); *Bates v. Lee*, 308 F.3d at 421 (comments about lack of remorse demonstrated by defendant's courtroom demeanor did not violate defendant's Fifth Amendment rights) (citation omitted).  The North Carolina Supreme Court's rejection of this claim was not contrary to nor an unreasonable application of clearly established federal law.  *See* § 2254(d)(1).

### B.  Biblical Argument

Davis claims that the prosecutor urged jurors to follow Biblical law and then argued that Biblical law, the teachings of Jesus, and the Christian religion endorsed the death penalty in this case.  Davis points to the following from the prosecutor's argument,

> Now, I'm going to close with some brief remarks from or about the Bible, and I'm going to be brief about that because I don't wish to offend those jurors who won't be thinking about, and our Supreme Court doesn't want us to make biblical arguments.  And we asked all of you if you could follow the laws of this case and the laws of man.  I make any remarks in anticipation of these issues because we've had witnesses about this.  In the Book of Matthew we're told about when the Herodians . . . came to test Jesus about the powers of the government, and they asked Jesus if it was lawful to pay taxes to the government. . . . And Jesus said, "Show me the coin that you use to pay the taxes," and they showed him the coin, and he said, "Whose picture appears and whose inscription is on the coin," and

they said, "Caesar's."  And he said, "Then render unto Caesar what is Caesar's, and unto God what is God's."  And for the purposes of this trial, Phillip Antwan Davis is Caesar's and these are Caesar's laws.  And the Bible instructs us about individual behaviors and about the authorities and . . . there's the story about the adulteress brought before Jesus by the crowd, and they were planning to stone her.  And Jesus . . . told them, "He who is without sin cast the first stone."  And that, ladies and gentlemen, is the difference between justice and vengeance.  If I cast that stone, that's vengeance, because I am biased.  If Sergeant Shroat would have put a bullet in his head that night, that is vengeance, and he is not privileged to cast that stone because he is biased.  The jury swore an oath and you all promised that you wouldn't be biased, that you would hear the evidence, that you'd decide in accordance with the law, and sitting as a body under those circumstances with those promises you are sinless and you may cast that stone, and cast it you must.

(Sent. Tr. 1293-94.)

As was clear to the North Carolina Supreme Court, the prosecutor invoked the Bible to urge jurors to follow *secular* law.  By her own admission, she did this in anticipation of an expected defense argument that the death penalty is contrary to biblical principals.  The prosecutor did not invoke biblical law to justify the morality of the death penalty.  *See, e.g., Bennett*, 92 F.3d at 1346 (Prosecutor's argument "improperly drew on his reading of the biblical law to justify the morality of the state's death penalty.").  Her argument was that the secular law, which jurors had taken an oath to follow, allowed for the death penalty and that the death penalty should be imposed in this case.

To the extent that the prosecutor's arguments could be considered improper, when viewed in the context of the entire trial, they did not "so infect[ ] the trial with unfairness as to make the resulting [sentence] a denial of due process."  *Darden*, 477 U.S. at 181 (citation omitted).  Joyce Miller's death was gruesome and agonizing; Davis lay in wait for her after killing her daughter, and his actions in the aftermath of the murders appeared calculated and cold-blooded.

Additionally, Davis's attorney also made biblical arguments to the jury, albeit in response to the prosecution's argument. Given the totality of the circumstances, the prosecutor's argument did not render the proceedings fundamentally unfair. *See Bennett*, 92 F.3d at 1345.

For the foregoing reasons, the North Carolina Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law. *See* § 2254(d)(1). Likewise, the MAR court's rejection of Davis's claim that counsel were ineffective for failing to object to the prosecutor's argument was neither contrary to nor an unreasonable application of clearly established federal law. *See id.*

### C. Misstatement of Law

Davis claims that the prosecutor misstated North Carolina law when she made the following argument:

> The Supreme Court says, in <u>State vs. Jones</u>, that prosecutorial argument encouraging the jury to lend an ear to the community is not proper. However, encouraging the jury to act as the voice and conscience of the community is proper and is one of the very reasons for the establishment of the jury system. So regardless of all the people who would come before you and ask you to listen to the community about the defendant's life, that is not what the law says.

(Sent. Tr. 1290.) The trial court overruled defense counsel's objection. Davis argues that this argument informed the jury that under North Carolina law it did not have to listen to, consider, or give effect to mitigating evidence offered by the defense.

The North Carolina Supreme Court determined that the prosecutor correctly stated that jurors must not lend an ear to the community and that the jurors may act as the voice and conscience of the community. A state court's decision on a question of state law is not subject to

review by a federal habeas court.  *See Roach v. Angelone*, 176 F.3d 210, 217 (4th Cir. 1999).

Therefore, the North Carolina appellate court's conclusion that the prosecutor correctly stated

North Carolina law is not subject to review by this Court.  *See Estelle*, 502 U.S. at 68.  The State

court went on to note that since no witness had asked the jury to listen to the community, it was

not clear what the prosecutor was referring to in the last sentence of her argument.  However, in

the unlikely event that jurors construed her argument as an instruction that they did not have to

consider Davis's mitigating evidence, that misconception would have been cleared up by the

judge's instruction that "it would be your duty to consider as a mitigating circumstance any aspect

of the defendant's character or record or any of the circumstances of this murder that the

defendant contends is a basis for a sentence less than death . . . ."  (Sent. Tr. 1389, 1423.)

Given the totality of the circumstances, the prosecutor's argument did not render the

proceedings fundamentally unfair.  *See Bennett*, 92 F.3d at 1345.  For the foregoing reasons, the

North Carolina Supreme Court's rejection of this claim was neither contrary to nor an

unreasonable application of clearly established federal law.  *See* § 2254(d)(1).

### D.  Extra-record Evidence

Davis claims that he was deprived of a fair trial when the prosecutor traveled outside the

evidentiary record during closing arguments.  Specifically, Davis takes issue with the prosecutor's

assertion that "we don't have a written report" from Dr. Noble.  Additionally, Davis points to the

prosecutor's speculations about what Davis and Joyce Miller might have said and thought in

particular situations, specifically: 1) Davis said to his uncle in spring 1996, "Fuck you man, I ain't

driving a '66 Impala that you fix up for me.  I'm getting the [Ford] Bravada;" 2) Joyce Miller said

to Davis in spring 1996, "if anything else gets gone, Phillip, you're history, you're leaving . . . you're not staying here because you can't;" and 3) when Joyce Miller arrived home on May 24, she "thought Caroline was home." (Sent. Tr. 1276, 1281, 1292.)

The record indicates that the prosecutor did not rely on extra-record evidence when she stated "we don't have a written report" from Dr. Noble. Dr. Noble testified that he produced a written report of his findings and conclusion on July 30, 1997. (Sent. Tr. 1005.) Therefore, it appears that the prosecutor misstated the evidence. The jurors were present when Dr. Noble testified that he had produced a written report. The trial judge instructed the jurors that they were to be guided by their own recollections of the evidence, even if those recollections conflicted with an attorney's summation of the evidence during closing arguments. (Sent. Tr. 1274, 1426.) Except in extraordinary circumstances, jurors are assumed to follow a court's instructions. *See Richardson*, 481 U.S. at 206. As such, this Court must assume that the jurors were guided by their own recollections of the witnesses' testimony and not the prosecutor's misstatement. Given the totality of the circumstances, the prosecutor's argument did not render the proceedings fundamentally unfair. *See Bennett*, 92 F.3d at 1345.

As for the prosecution's speculations about what Davis or Joyce Miller were thinking or saying at certain times, the prosecutor is entitled to argue to the jury "the law and the facts in evidence and all reasonable inferences to be drawn therefrom." *State v. Monk*, 212 S.E.2d 125, 131 (N.C. 1975) (citations omitted). Evidence from the record tends to show that Davis's aunt and cousin believed that he was stealing from them. The record also shows that Davis was angry at his cousin and aunt for taking items belonging to him. Davis told police that several days before the murders, his aunt had pointed a gun at him and told him that if anything else was stolen

73

from her home, she would kill him.  The prosecutor pointed to testimony that Joyce was afraid to touch the gun and argued that the more likely scenario was that his aunt had told him that if he stole anything else, she would put him out of the house.

The State also argued that Davis had a sense of entitlement and wanted to have and own nice things.  So, the State argued, he stole money from his aunt to buy clothes and jewelry.  The record shows that after killing his aunt, Davis took her credit cards and went on a shopping spree.  The State also speculated that Davis would not have been satisfied with the 1966 Impala that his uncle offered to fix up for him and wanted his aunt's Bravada instead.  After killing his aunt, Davis took the Bravada.

The prosecution's arguments were reasonable inferences drawn from the evidence presented at trial.  To the extent that they were not reasonable, the prosecutor's arguments did not render the proceedings fundamentally unfair, given the totality of the circumstances.  *See Bennett*, 92 F.3d at 1345.  For the foregoing reasons, the North Carolina Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established Federal law.  *See* § 2254(d)(1).  Likewise, the MAR court's rejection of Davis's claim that counsel were ineffective for failing to object to the prosecutor's arguments was neither contrary to nor an unreasonable application of clearly established federal law.  *See id*.

CLAIM X:  *Improper Closing Arguments*

Davis claims that his due process right to a fair sentencing hearing was violated because the trial court allowed the State to ask "impertinent and badgering" questions during the capital sentencing hearing.  Davis cites 24 examples of allegedly "impertinent and badgering" questions.

The North Carolina Supreme Court found that Davis had waived appellate review of a number of these questions by either failing to object to them at trial or failing to move to strike after an objection had been sustained. The appellate court rejected challenges to the remaining questions on evidentiary grounds. The State raises procedural default as a defense to those questions waived on appellate review.

By failing to raise a timely objection or a motion to strike at trial, Davis failed to preserve for his direct appeal a constitutional challenge to many of the questions at issue in this claim. *See* N.C. R. App. P. 10(b)(1).[20] Because Davis failed to preserve a constitutional challenge to the prosecutors' questions for his direct appeal, this claim is procedurally defaulted on federal habeas review. *See Daniels v. Lee*, 316 F.3d 477, 486-488 (4th Cir. 2003); *Howard v. Moore*, 131 F.3d 399, 420 (4th Cir. 1997) ("Errors at trial not objected to, in contravention of State contemporaneous objection rules, are not cognizable in federal habeas corpus proceedings . . . .") (citation omitted). This is the case even though the state appellate court reviewed the challenged questions on direct appeal for "plain error." *See Daniels*, 316 F.3d at 487 (citing *Davis v. Allsbrooks*, 778 F.2d 168, 176 (4th Cir. 1985)). In *Davis*, the Fourth Circuit held that the rule barring habeas review of a claim rejected by a state court on a procedural ground applies even when a state court conducts a plain error review after having found a procedural default. *See id*.; *see also Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001) ("We have held that [a] contemporaneous objection rule . . . bars federal habeas review absent a showing of cause and

---

[20]North Carolina Rule of Appellate Procedure 10(b)(1) states that in order to preserve a question for appellate review, "a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context . . . ."

prejudice. . . . Moreover, we view a state appellate court's review for plain error as the enforcement of a procedural default.").  Thus, when the North Carolina Supreme Court reviewed the questions for "plain error," it was applying a North Carolina procedural rule.  *See id*.

Davis has failed to demonstrate cause and prejudice or that a fundamental miscarriage of justice would occur to excuse his failure to preserve these challenges by a timely objection or motion to strike.  *See Wainwright v. Sykes*, 433 U.S. 72, 82, 97 S.Ct. 2497 (1977).  Indeed, Davis has alleged neither cause nor prejudice with respect to his failure to timely object to or to seek a motion to strike the prosecutors' questions.  Therefore, with regard to those challenged questions, this claim is procedurally defaulted.

The State Court determined that objections to the remaining questions were properly overruled because Davis had previously injected the evidence into the proceedings or allowed it to be admitted into evidence earlier with no objection.  Although couched as a constitutional claim, this really is a complaint about how the trial court applied the North Carolina rules of evidence at trial.  In federal habeas actions, the court does not sit "to review the admissibility of evidence under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding."  *Burket v. Angelone*, 208 F.3d 172, 186 (4th Cir. 2000) (refusing to consider on habeas review two affidavits struck by the State post-conviction court on evidentiary grounds) (citations omitted) .

The trial court overruled an objection to the prosecutor's question to Sergeant Shroat regarding whether Davis had blamed Joyce Miller for the murders.  Davis has failed to show why this information was not relevant.  Not only does Davis's statement go to his state of mind at the

time of the murders, it is relevant to the issue of whether he was remorseful for what he had done. The trial court also overruled several objections to questions regarding whether witnesses had shared a particular biblical verse with Davis (Romans 13: 1-6). The defense opened the door to these questions by eliciting testimony from those witnesses about discussions they had had with Davis about the Bible and its teachings. The defense also opened the door to the prosecutor's question regarding Joyce Miller stepping in and getting a bullet and ax to the head. The witness had testified on direct that he and a number of others knew that Davis came from a troubled home and speculated that the murders might not have happened if he and others had been willing to "step in" and help Davis out when he was younger. The prosecutor's pointed question reminded the jury that Davis killed the person who did step in to help him.

While the prosecutor's question regarding whether Phyllis Davis's son Patrick had "ax-murdered anyone yet" and whether another witness still would support Davis, "[i]f he gets hold of a shank in prison and kills a guard," could be viewed as argumentative, they did not render his trial fundamentally unfair. Therefore, the state court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established Federal law. *See* § 2254(d)(1).

CLAIM XI: *Bad Character Evidence*

Davis claims that his due process rights to a fundamentally fair capital sentencing hearing were violated when 1) the trial court admitted evidence of Davis's bad character during the State's case-in-chief; 2) the trial court allowed the State to cross-examine defense witnesses about Davis's bad character; and 3) the trial court permitted the State to cross-examine witnesses about their knowledge of the food Davis ate while in jail pending trial. Davis raised these as separate

claims on direct appeal to the North Carolina Supreme Court, which rejected all of them on the merits.

Under North Carolina law, the rules of evidence do not apply in sentencing proceedings. *See* N.C. Gen. Stat. § 8C-1, Rule 1101(b)(3) (1997). The State may present "*any* competent, relevant evidence relating to the defendant's character or record which will substantially support the imposition of the death penalty so as to avoid an arbitrary or erratic imposition of the death penalty." *State v. Brown*, 337 S.E.2d 808, 824 (N.C. 1985), *overruled on other grounds by State v. Vandiver*; 364 S.E.2d 373 (N.C. 1988); N.C. Gen. Stat. § 2000(b)(3) (1997) (any evidence that the court deems relevant or to have probative value may be received at sentencing). The State also may offer character evidence to rebut specific character evidence first offered by the defense. *See State v. Carter*, 451 S.E.2d 157, 173 (N.C. 1994).

The North Carolina Supreme Court held that admission of the "bad character" evidence in both the State's case-in-chief and on cross-examination of the defense witnesses was proper. As for the State's cross-examination of witnesses regarding their knowledge of Davis's food consumption in jail, the appellate court held that despite the questionable relevance of such evidence, its admission did not constitute plain error.[21]

As a general rule, the admissibility of evidence is a matter of state law and procedure. *Grundler v. North Carolina*, 283 F.2d 798, 802 (4th Cir. 1960). The appellate court held that in each of the instances complained of by Davis, the trial court acted within state law. In other words, the evidence was admissible at sentencing. It is not the role of a federal habeas court "to

---

[21]Davis failed to object or waived the benefit of objection when this evidence was elicited at trial.

reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle*, 502 U.S. at 67-8.  The only issue before this Court is whether admission of this "bad character" evidence gave rise to "circumstances impugning fundamental fairness or infringing specific constitutional protections."  *Grundler*, 283 F.3d at 802.

Davis asserts that he was prejudiced by the State's introduction during its case-in-chief of evidence regarding Davis's temperament, a fight he had with his girlfriend at work, an admission to police that he had smoked marijuana after the murders, and a high school homework assignment that showed his knowledge of drugs and the drug trade.  However, testimony that Davis had a "bad temper" and that he would "snap" if he felt that someone had "did [sic] him wrong," as well as evidence that Davis had been fired for fighting with his girlfriend at work would appear to support Dr. Noble's testimony that Davis had a personality disorder.  According to Dr. Noble, Davis's borderline personality disorder caused him to be emotionally unstable, impulsive and have difficulties in interpersonal relationships.  In addition to supporting Dr. Noble's diagnosis of cannabis abuse, the fact that Davis smoked marijuana shortly after the murders was relevant to his state of mind at that time.

On cross-examination and on direct examination of its own witnesses, defense counsel elicited testimony that Davis was a good worker, worked during high school, played football and basketball, had taken the SAT to try to get into college, took an Air Force admission test, had a girlfriend he took to the prom, was polite, had a good attitude, was an overachiever, and behaved appropriately at school.  In other words, the defense elicited testimony that Davis was a person of generally good character.  Evidence elicited through cross-examination that Davis sold and used

illegal drugs, had parties in hotel rooms, pushed his grandfather down, slapped his girlfriend, had been arrested for drug offenses and violated jail rules was proper rebuttal to the image painted by defense witnesses that Davis was a hard-working, rule-abiding, well-behaved young man.

Finally, while this Court, like the North Carolina Supreme Court before it, questions the relevance of the type and quantity of food Davis ate in jail while awaiting trial, its admission on cross-examination did not so prejudice Davis that he was denied a fundamentally fair sentencing hearing. The Court is skeptical that any reasonable juror would have been swayed toward the death penalty by the prosecutor's tenuous argument that Davis's consumption of junk food was evidence of his lack of remorse.

For the foregoing reasons, the North Carolina Supreme Court's rejection of these claims was neither contrary to nor an unreasonable application of clearly established federal law. *See* § 2254(d)(1). Likewise, the MAR court's rejection of Davis's claim that counsel were ineffective for failing to object to the admission of evidence regarding what Davis ate in jail was neither contrary to nor an unreasonable application of clearly established federal law. *See id*.

CLAIM XII: *Double Hearsay Evidence*

Davis claims that his Confrontation Clause rights and his right to a fair sentencing hearing were violated when the trial court admitted the testimony of a Buncombe County Detective regarding statements Joyce Miller's foster child made to another police officer. Davis makes the same claims regarding the testimony of a defense witness regarding a classroom incident involving Davis that he had heard from another teacher who had heard it from someone else. Davis claims in the alternative that counsel were ineffective for failing to raise constitutional

objections to the Detective's testimony.[22]  The State raises the defense of procedural default as to several of these claims.

### A.  Substantive Confrontation Clause and Due Process Claims

Detective Connie Searcy testified that Officer Michele Daugherty told her that Damion, Joyce Miller's five-year-old foster son, told Officer Daugherty that a man named "Matthew" had shot Joyce with a white gun and that he had "pointed the gun at me, the man did . . . ."  Officer Daugherty also told Detective Searcy that Damion had said that the man "[l]ooked like a monster," and that "[h]e might kill somebody else."

The North Carolina Supreme Court held that by failing to object to this testimony, Davis waived the constitutional issues on appeal.  *See Davis*, 539 S.E.2d at 256 (citing N.C. R. App. P. 10(b)(1)).  North Carolina Rule of Appellate Procedure 10 is an adequate and independent state procedural rule.  *See e.g. Kornahrens v. Evatt*, 66 F.3d 1350, 1357 (4th Cir. 1995) ("[I]f a defendant defaults by not following proper state appellate procedure, causing the state courts to rule against him solely on state-law procedural grounds, [the federal courts] have no power to review his defaulted issues because they are based solely on state procedural grounds rather than federal constitutional grounds.").  Because Davis failed to preserve a constitutional challenge to the Detective's testimony for his direct appeal, this claim is procedurally defaulted on federal habeas review.  *See Daniels*, 316 F.3d at 486-488; *Howard v. Moore*, 131 F.3d at 420 ("Errors at trial not objected to, in contravention of State contemporaneous objection rules, are not

---

[22]Davis has not raised a similar IAC claim with regard to Stephen Chandler's cross-examination testimony.

cognizable in federal habeas corpus proceedings . . . .") (citation omitted).[23]

The same is true for Davis's claim that the trial court erred in allowing Stephen Chandler, Davis's history teacher and football coach, to be cross-examined about an incident in Davis's Spanish class, despite the fact that Chandler had no personal knowledge of the incident. On direct examination, Chandler testified that Davis never had a behavioral problem, always participated in class, came to practice on time, and was never a discipline problem. On cross-examination, when the prosecutor asked Chandler about an incident in Spanish class, the trial court held a *voir dire*. Over objection, Chandler testified that another teacher had told him that he had heard from the Spanish teacher that Davis had gotten in trouble in Spanish class for engaging in "aggressive" behavior toward the teacher.

The North Carolina Supreme Court reviewed the trial court's actions for abuse of discretion because Davis had raised an objection. However, because Davis failed to object on *constitutional* grounds, that issue was waived, and the appellate court reviewed the trial court's actions for plain error. *See Davis*, 539 S.E.2d at 258. Because Davis waived a constitutional challenge to Chandler's hearsay testimony for his direct appeal, this claim is procedurally defaulted on federal habeas review. *See Daniels*, 316 F.3d at 486-488.

Davis has failed to demonstrate cause and prejudice or that a fundamental miscarriage of justice would occur to excuse his failure to preserve these issues by a timely objection. *See Sykes*,

---

[23]As noted in a previous section of this Order, the claim is defaulted even though the North Carolina Supreme Court reviewed the challenged questions on direct appeal for "plain error." *See Allsbrooks*, 778 F.2d at 176 (barring habeas review of a claim rejected by a state court on a procedural ground when a state court conducts a plain error review after having found a procedural default).

433 U.S. at 82.  Indeed, Davis has alleged neither cause nor prejudice with respect to his failure to timely object to Detective Searcy's or Stephen Chandler's testimony.  Therefore, this claim is procedurally defaulted.

### B.  IAC Claim

Davis claims that counsel were ineffective for failing to raise constitutional objections at trial to Detective Searcy's testimony.  Davis asserts that Damion's statements, as relayed by Detective Searcy, were unreliable, inadmissible hearsay evidence.  The MAR court denied this claim on the merits.

As noted previously, in order to prevail on an IAC claim, Davis must first show that counsel's representation was deficient and must next show that counsel's errors prejudiced the defense so seriously "as to deprive the Defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687-88.  The Court must determine whether counsel's failure to object to Detective Searcy's testimony on constitutional grounds was deficient and, if so, whether counsel's deficiency resulted in prejudice to Davis.  In order to make this determination, the Court must examine whether admission of the testimony violated Davis's Confrontation Clause or due process rights.  If it did, the Court must next determine whether Davis was prejudiced by counsel's failure to object.

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted by the witnesses against him." *Crawford v. Washington*, 541 U.S. 36, 42, 124 S.Ct. 1354 (2004).  The Supreme Court has not held that sentencing proceedings are "criminal prosecutions" for Sixth Amendment purposes. *See United States v. Johnson*, 935

F.2d 47, 50 (4th Cir. 1991). As such, there is no clearly established federal law that the Confrontation Clause applies in a capital sentencing proceeding. *See United States v. Roche*, 415 F.3d 614, 618 (7th Cir.2005) ("[W]itnesses providing information to the court after guilt is established are not accusers within the meaning of the confrontation clause."), *cert. denied,* 546 U.S. 1024, 126 S.Ct. 671 (2005)*; United States v. Luciano*, 414 F.3d 174, 179 (1st Cir.2005) ("[T]here is no Sixth Amendment Confrontation Clause right at sentencing."); *United States v. Martinez*, 413 F.3d 239, 243 (2d Cir.2005) (reaffirming prior holdings that the constitutional right of confrontation does not bar the admission of hearsay testimony at sentencing proceedings), *cert. denied,* 546 U.S. 1117, 126 S.Ct. 1086 (2006)*; United States v. Higgs*, 353 F.3d 281, 324 (4th Cir. 2003) ("It is far from clear that the Confrontation Clause applies to a capital sentencing proceeding."); *United States v. Silverman*, 976 F.2d 1502, 1514 (6th Cir. 1992) (en banc) (discussing the "inapplicability of the Confrontation Clause to the sentencing procedure"). Consequently, there is no clearly established federal law that introduction of hearsay evidence at a sentencing proceeding violates a defendant's rights under the Confrontation Clause. Therefore, counsel were not deficient for failing to object to Detective Searcy's testimony on Sixth Amendment grounds.

Hearsay also is not prohibited on due process grounds provided the hearsay statements are relevant and bear indicia of reliability. *See Williams v. State of Oklahoma*, 358 U.S. 576, 584, 79 S.Ct. 421 (1959) ("[O]nce the guilt of the accused has been properly established, the sentenc[er] . . . , in determining the kind and extent of punishment to be imposed, is not restricted to evidence derived from the examination and cross-examination of witnesses in open court but may, consistently with the Due Process Clause of the Fourteenth Amendment, consider responsible

unsworn or 'out-of-court' information relative to the circumstances of the crime and to the convicted person's life and characteristics."); *Williams v. People of State of New York*, 337 U.S. 241, 69 S.Ct. 1079 (1949). Davis argues that Damion's statements were both irrelevant and unreliable because they were made by a five-year-old child, and there was no evidence that the child knew the importance of telling the truth. Because there was no objection to Detective Searcy's testimony, the trial court did not make any findings of fact with regard to the reliability of Damion's statements to Officer Daugherty.

Assuming *arguendo* that counsel were deficient for failing to object to Searcy's testimony, Davis cannot show that he was prejudiced. Not only did Damion talk to Officer Daugherty, he talked to Detective Searcy, and much of what he said did not comport with the facts of the case. Although Damion got some facts right, for example, he told Detective Searcy that the man who shot Joyce put Joyce's purse in a white trash bag and stole Joyce's truck, he also insisted that the man who had shot Joyce was named Matthew, that the man was older than Joyce, that he did not know the man, and that the man was not a friend of Joyce's or Caroline's. Furthermore, when specifically asked by Detective Searcy whether Davis was home at the time of the murder, Damion responded that Davis was at school at the time. All of this would have raised questions in jurors minds about Damion's credibility. However, assuming that all of the jurors believed Damion's statement that Davis had pointed a gun at him, that information cuts both ways. On the one hand, it shows that Davis was not above pointing a gun at a small, terrified child. On the other hand, it shows that Damion witnessed Joyce's murder or the immediate aftermath and that Davis knew it. He also knew that Damion was old enough to identify him but did nothing to harm the child other than to point a gun at him that he (Davis) knew was empty.

As for Damion's statement that the murderer looked like a "monster," it would not have strained the jury's imagination to consider that a man covered in blood would look like a monster to a frightened five-year old. Nor is the Court persuaded by Davis's argument that the jury was driven to recommend a death sentence by Damion's opinion that "he might kill somebody else." While Damion's opinion is of questionable relevance, evidence of future dangerousness is not improper in a sentencing proceeding. *See State v. Williams*, 510 S.E.2d 626, 644 (N.C. 1999). As such, the prosecution elicited evidence regarding Davis's conduct while in jail awaiting trial and his prior violent acts against his girlfriend. Additionally, the prosecution obtained an acknowledgment from Dr. Noble that Davis had the potential to be dangerous in the future. To the extent that the jury considered "future dangerousness" in their deliberations, the Court is inclined to believe that the jury would be more persuaded by Davis's past behavior and Dr. Noble's opinion than by a five-year-old's view on the matter.

Finally, the Court is not persuaded that the reason the jury failed to find that Davis did not have a significant history of prior criminal activity was because there was testimony that Davis had pointed a gun at Damion. It is more likely that the jury determined that the murder of Caroline Miller qualified as a significant history of prior criminal activity. For the foregoing reasons, the MAR court's rejection of Davis's IAC claim was neither contrary to nor an unreasonable application of established Federal law. *See* § 2254(d).

CLAIM XIII: *Exclusion of Proffered Mitigating Evidence*

Davis claims that the trial court erred in excluding the testimony of Colin Wilmont, a friend from high school, that in Wilmont's opinion, Davis could have a positive impact in prison

if he counseled kids to stay out of trouble. According to Davis, this was powerful mitigating evidence that could have tipped the scales in favor of a sentence less than death.

Davis raised this claim on direct appeal to the North Carolina Supreme Court, which rejected it on the merits. The court held that the proffered evidence was purely speculative and that the trial court did not err in excluding it. The court further held that even if exclusion of the proffered evidence was erroneous, the error was harmless beyond a reasonable doubt.

The United States Supreme Court has held that a sentencer "may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S.Ct. 757, 761 (1998) (citations omitted). Mitigating evidence is "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954 (1978) (plurality opinion).

Wilmont's opinion that Davis could be a positive influence if he chose to become involved in a program counseling kids to stay out of trouble was not mitigating evidence in that it did not pertain to "any aspect of [ ] defendant's character or record and any of the circumstances of the offense . . . ." *Lockett*, 438 U.S. at 604. Wilmont's opinion was not based upon any experience he had had with Davis in a prison setting. Nor was there any evidence that Davis had expressed a desire to participate in such a program. Wilmont's testimony was merely a speculation that *if* such a program existed, and *if* Davis was willing to participate, he *could* be a positive influence on kids. The trial court did not err when it excluded Wilmont's testimony.

Even if the trial court did err in excluding this testimony, such error did not have a

"substantial or injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at

637. Davis cannot show that exclusion of Wilmont's opinion resulted in "actual prejudice." *Id*.

(citation omitted). For the foregoing reasons, the North Carolina Supreme Court's rejection of this

claim was neither contrary to nor an unreasonable application of clearly established federal law.

*See* § 2254(d)(1).

CLAIM XIV: *Erroneous Jury Instruction for Mitigating Circumstance*

Davis claims that the trial court's jury instructions on mitigating circumstance N.C. Gen.

Stat. § 15A-2000(f)(1) violated his due process rights. Section 15A-2000(f)(1) provides that a

mitigating circumstance in capital sentencing may be that "[t]he defendant has no significant

history of prior criminal activity." Davis argues that the trial court's instructions peremptorily

charged the jury that he had a history of prior criminal activity. Specifically, Davis attacks the

trial court's instruction that the jury would find the (f)(1) circumstance if, "you find that the

assault, drug offenses, use of illegal drugs and gambling or any other acts were not a significant

history of prior criminal activity." Davis argues that the court essentially instructed the jury that

the State's evidence regarding alleged criminal conduct by Davis was true. The State raises the

defense of procedural default.

Davis raised this claim on direct appeal to the North Carolina Supreme Court. The North

Carolina Supreme Court held that by failing to object to the court's instruction, Davis had waived

the constitutional issues on direct review. *See Davis*, 539 S.E.2d at 267 (citing N.C. R. App. P.

10(b)(2)). North Carolina Rule of Appellate Procedure 10 is an adequate and independent state

procedural rule. *See e.g. Kornahrens*, 66 F.3d at 1357 ("[I]f a defendant defaults by not following

proper state appellate procedure, causing the state courts to rule against him solely on state-law procedural grounds, [the federal courts] have no power to review his defaulted issues because they are based solely on state procedural grounds rather than federal constitutional grounds."). Because Davis failed to preserve a constitutional challenge to the court's instruction for his direct appeal, this claim is procedurally defaulted on federal habeas review. *See Daniels*, 316 F.3d at 486-488; *Howard*, 131 F.3d at 420.[24]

Davis has failed to demonstrate cause and prejudice or that a fundamental miscarriage of justice would occur to excuse his failure to preserve this issue by a timely objection. *See Sykes*, 433 U.S. at 82. Indeed, Davis has alleged neither cause nor prejudice with respect to his failure to timely object to the court's instruction. Therefore, this claim is procedurally defaulted.

Furthermore, this claim is without merit because Davis cannot show that he was prejudiced by the instruction. The trial court gave the same instruction for the §15A-2000(f)(1) mitigating circumstance for the murder of Caroline Miller. In that case, the jury found that Davis "ha[d] no significant history of prior criminal activity." §15A-2000(f)(1). In other words, even if the jury accepted as true that Davis had assaulted his girlfriend, sold illegal drugs and gambled, it did not find his prior criminal activity significant. The jury did not find the (f)(1) mitigating circumstance for the murder of Joyce Miller. The difference, of course, was that by the time he murdered Joyce, Davis had murdered Caroline, thereby adding significantly to his history of prior

---

[24]As noted in a previous section of this Order, the claim is defaulted even though the North Carolina Supreme Court reviewed the challenged instruction on direct appeal for "plain error." *See Allsbrooks*, 778 F.2d at 176 (rule barring habeas review of a claim rejected by a state court on a procedural ground applies even when a state court conducts a plain error review after having found a procedural default).

criminal activity.  This claim is procedurally defaulted and without merit.

CLAIM XV: *Erroneous Jury Instruction for Aggravating Factor*

Davis claims that his right to a reliable sentencing determination was violated when the trial judge omitted an essential element from his instructions to the jury on an aggravating factor. Specifically, the judge omitted the timing element from his instructions on the aggravating circumstance that the murder of Joyce Miller was committed while Davis was engaged in the commission of armed robbery.

During the charge conference, the prosecution sought submission of the aggravating circumstance that "[t]he capital felony was committed while the defendant was engaged . . . in the commission of . . . robbery."  N.C. Gen. Stat. § 15A-2000(e)(5).  The (e)(5) circumstance is designed to "guide[ ] the jury's deliberation upon criminal conduct of the defendant which takes place 'while' or during the same transaction as the one in which the capital felony occurs."  *Davis*, 539 S.E.2d at 264 (quoting *State v. Goodman*, 257 S.E.2d 569, 584 (N.C. 1979)).  In Davis's case, the prosecution requested that the court use its proffered (e)(5) jury instruction instead of the pattern instruction.  Defense counsel objected and asked that the court use the pattern (e)(5) jury instruction.  However, the trial court overruled counsel's objection and used the prosecution's (e)(5) instruction instead.

During the jury charge, the trial court instructed, in part:

[F]our aggravating circumstances . . . may be applicable to the case of Joyce Miller: First, "Was this murder committed by the defendant while the defendant was engaged in the commission of armed robbery?" . . . It is sufficient to support this aggravating circumstance that the defendant committed this murder while engaged in the commission for an armed robbery even if the armed robbery was committed after Joyce Miller was killed, so long as the armed robbery occurred

during a continuous series of events surrounding Joyce Miller's death.

Now, I charge that for you to find that the defendant committed this murder while engaged in the commission of the armed robbery, the State must prove seven things beyond a reasonable doubt. . . . .

(Sent. Tr. 1381-1384.) The instruction listed seven things that comprised the elements of armed robbery but did not require a finding that the murder was committed *while* Davis was engaged in an armed robbery. During deliberations, the jury requested reinstruction on the armed robbery circumstance. The trial court repeated the prosecution's (e)(5) instruction in full. Defendant again objected. The jury subsequently found the (e)(5) circumstance to exist.

On direct review, the North Carolina Supreme Court held that the trial court erred in giving the prosecution's (e)(5) instruction because it lacked the requisite timing element. In comparison, the North Carolina pattern (e)(5) jury instruction includes a timing element that requires the jury to "find from the evidence beyond a reasonable doubt that *when the defendant killed the victim*" the elements necessary to commit the felony were fulfilled. *See Davis*, 539 S.E.2d at 265 (citing N.C.P.I.-Crim. 150.10(5A) (1997) (emphasis added). The consequence of giving the prosecution's instruction rather than the pattern (e)(5) instruction was that the prosecution was able to prove (e)(5) without having to prove that the murder occurred *while* Davis was engaged in an armed robbery. However, the North Carolina Supreme Court concluded that the error was "harmless beyond a reasonable doubt." *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824 (1967).

In *Neder v. United States*, the United States Supreme Court held that omission of an element of an offense from the judge's charge to the jury is subject to harmless error analysis. 527 U.S. 1, 12-13, 119 S.Ct. 1827 (1999). As noted in a previous footnote, the "substantial and

injurious effect" standard set forth in *Brecht v. Abrahamson*, 507 U.S. at 637, applies on collateral review of this claim, notwithstanding the North Carolina Supreme Court's application of the *Chapman* "harmless beyond a reasonable doubt" standard on direct review. *See Fry v. Pliler*, 127 S.Ct. 2321, 2328 (2007) (holding that *Brecht* standard applies on collateral review whether or not the state appellate court reviewed the error for harmlessness under the *Chapman* standard). In applying the *Brecht* standard, the Court is required to review the record *de novo* to determine whether omission of the timing element "substantially sway[ed] or substantially influence[d]" the jury's decision to recommend a sentence of death. *See Gilbert v. Moore*, 134 F.3d 642, 648 (4th Cir. 1998). A review of the record from Davis's trial reveals that the omission of the timing element had no substantial or injurious effect on the jury's sentencing recommendation.

Notwithstanding its failure to instruct the jury on the requisite timing element, the trial court instructed and then reinstructed the jury that it could find the (e)(5) aggravating circumstance if it determined that the armed robbery occurred during a continuous series of events surrounding Joyce Miller's death. Specifically, the court instructed that, "[i]t is sufficient to support this aggravating circumstance that the defendant committed this murder *while* engaged in the commission of an armed robbery even if the armed robbery was committed after Joyce Miller was killed, so long as the armed robbery occurred *during a continuous series of events surrounding Joyce Miller's death*." (emphasis added) This is a correct statement of North Carolina law. *See State v. Fields*, 337 S.E.2d 518, 525 (N.C. 1985) (holding that whether a defendant has committed armed robbery is not dependent upon the victim being alive when his possessions are taken provided that the elements of armed robbery occur under circumstances such that the death and the taking constitute a single transaction). Furthermore, the Issues and

Recommendations sheet for Joyce Miller presented the (e)(5) aggravating circumstance as follows: "Was this murder committed by the Defendant *while* the Defendant was engaged in the commission of Armed Robbery?" (State Ex. 3 (R. on Appeal) 152) (emphasis added.)

The jury found beyond a reasonable doubt that Davis had committed an armed robbery. Having accepted that Davis committed an armed robbery, no reasonable jury could have failed to find that Joyce Miller's murder occurred during the commission of that armed robbery. In his confession, Davis indicated to the investigating officer that he killed Joyce at around 7:00 p.m. and that he placed the stolen property into Joyce's Bravada truck and drove to the mall at around 7:15 p.m. The jury was instructed that for the purposes of the armed robbery aggravating factor, it was to consider the taking of the keys to the Bravada, the Bravada itself, and one of the VCRs. The jury knew that Joyce was driving the truck when she arrived at home and that Davis, therefore, could not have taken the keys or truck until after she was dead. Furthermore, the jury knew that Caroline's car also was at the house and that Davis, presumably, could have taken that car at any point before or after Joyce's murder. Instead, he took the Bravada, so at some point, either before Joyce returned home or in the minutes after he killed her, Davis decided to take Joyce's truck when he left the house.[25] Again, according to his confession, he loaded the VCRs and Joyce's purses into the truck and left for the mall some fifteen minutes after killing her. The circumstances of the robbery and murder, as described in Davis's confession, would have precluded a reasonable jury from finding that the armed robbery occurred at a point disconnected

---

[25]Under North Carolina law, commission of armed robbery is not dependent upon whether the intention to commit the taking of the victim's property was formed before or after the killing. *See State Hartman*, 476 S.E.2d 328, 345 (N.C. 1996).

in time from the murder of Joyce Miller.

Finally, the Court notes that contrary to Davis's assertion in the instant claim, submission of the (e)(5) aggravating circumstance itself was not contested at trial. Davis now asserts that the timing issue was a disputed issue at the sentencing hearing. On the contrary, defense counsel did not object to submission of the (e)(5) aggravating circumstance that the murder was committed during the course of an armed robbery. Instead, defense counsel objected to the court's use of the prosecution's (e)(5) instructions[26] and the court's submission of both the (e)(5) and the (e)(6) aggravating circumstance that the murder was committed for pecuniary gain. It was defense counsel's position that either the (e)(5) or the (e)(6) aggravating circumstance could be submitted but not both. For all of the reasons outlined above, the omission of the timing element from the jury's instructions was harmless and provides no basis for relief.

CLAIM XVI: *IAC Regarding Peremptory Strike of African American Juror*

During jury selection, the prosecutor used a peremptory strike to excuse an African American juror, Wanda Jeter. Defense counsel raised a *Batson* objection, noting that Ms. Jeter was the first African American juror who had not been dismissed for cause. *See Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712 (1986) (reiterating that the Equal Protection Clause forbids the State from using peremptory challenges to exclude potential jurors on the basis of race).[27] However, after hearing the prosecutor's race-neutral explanations, the trial court found

_____

[26]The Court notes that defense counsel never objected on the grounds that the timing element was missing.

[27]The Court notes that the defense did not raise its *Batson* objection until after the trial court had released Ms. Jeter from service and the other jurors for a break.

94

that there was no *Batson* violation. Davis claims that his trial counsel were ineffective for failing to alert the trial court to evidence in the record that allegedly shows that the prosecutor's explanations for excusing Ms. Jeter were pretextual. Davis claims further that his appellate counsel were ineffective for failing on appeal to brief the trial court's denial of counsel's objection, despite having assigned this issue as error. The MAR court denied these claims on the merits.

In *Batson*, the Supreme Court articulated a three-part test by which a defendant may establish an Equal Protection Clause violation by the prosecution. 476 U.S. at 96-98. The defendant first must make a *prima facie* showing that the prosecutor executed a peremptory challenge on the basis of race. *See id*. at 96-97. Only after the defendant has made a *prima facie* case of discrimination is the prosecutor required to give a race-neutral explanation for his peremptory strikes. *See id*. at 97. It is then up to the trial court to determine if "the defendant has established purposeful discrimination." *Id*. at 98.

The record shows that when making the *Batson* objection, the defense noted only that Ms. Jeter was the first African American juror who had not been excused for cause and that her answers to the prosecutor's questions regarding her ability to impose the death penalty were in the affirmative and unequivocal. Contrary to Davis's assertion, the trial court did not find that the defense had made a *prima facie* showing of intentional discrimination on the part of the prosecution. In fact, the judge expressed skepticism on that point but added that, "[i]f the State wishes to put anything on the record insofar as Ms. Jeter, I will give them an opportunity to do so, if they so choose." (JS Tr. 265-66.) Despite having argued that the defense had not made a *prima facie* showing of discriminatory intent, the prosecution accepted the trial court's invitation to put

something on the record and gave three race-neutral reasons for excusing Ms. Jeter.  The trial

court then denied the *Batson* challenge.

Because the prosecutor offered race-neutral explanations for removing Ms. Jeter, and the

trial court found that there was no *Batson* violation, the issue of whether Davis made a *prima*

*facie* showing of discriminatory intent is moot.  *See Hernandez v. New York*, 500 U.S. 352, 359,

111 S.Ct. 1859 (1991).  Therefore, the Court is concerned only with whether the evidence Davis

now puts forward shows that the prosecutor's race-neutral explanations were pretextual.

The first reason given by the prosecution for excusing Ms. Jeter was that she was wearing

a cross-shaped earing, which the prosecutor argued suggested a religious influence that might

impact her ability to recommend the death penalty.  Davis argues that counsel should have pointed

out that when asked if she had any moral, religious or philosophical beliefs or opinions against the

death penalty, Ms. Jeter responded that she did not.  As an initial matter, and as noted previously,

trial counsel did point out to the trial court that Ms. Jeter's answers to the prosecutor's questions

regarding her ability to impose the death penalty were in the affirmative and unequivocal.

However, the prosecutor's explanation was more nuanced than Davis acknowledges.  The

prosecutor explained that the cross-shaped earring "suggests . . . a religious consideration that may

impact her ability to *actually* send someone to death, but the state doesn't know."  (JS Tr. 267)

(emphasis added.)  A prosecutor may use a peremptory strike to excuse a juror who has

reservations about the death penalty, even if the prosecutor's explanation for the strike does not

support a challenge for cause.  *See Brown v. Dixon*, 891 F.2d 490, 497-98 (4th Cir. 1989).  In this

instance, the prosecutor was pointing out that the absence of opposition to the death penalty does

not necessarily translate into the ability to actually recommend a death sentence.  While that could

be true of any of the prospective jurors who expressed no opposition to the death penalty, Davis has not pointed to any other juror who outwardly displayed a religious symbol, the wearing of which generally is associated with religious conviction. Davis has failed to show that the prosecutor's doubt about Ms. Jeter's ability to recommend a death sentence was pretextual.

The second reason the prosecutor gave for excusing Ms. Jeter was that she was wearing "a Tweetie Bird shirt with a very large depiction of a cartoon character wearing a purple ball cap backwards on it," which, the prosecutor argued, raised a question about how seriously Ms. Jeter took her jury summons. Davis faults trial counsel for failing to point out to the trial court that other jurors were "casually dressed."

In determining whether they are comfortable seating a prospective juror, trial attorneys rely on more than a prospective juror's answers. For example, they consider the juror's body language, whether the juror makes eye contact, the juror's tone of voice, whether the juror pays attention or seems to be distracted. How a prospective juror has chosen to dress in response to a jury summons also can be relevant to attorneys assessing whether that juror should remain or be excused. *See U.S. v. Grandison*, 885 F.2d 143, 149 (4th Cir. 1989) (government may exercise peremptory strike on basis of prospective juror's appearance and demeanor) ( citation omitted). While it may be true, as now alleged, that some of Davis's other jurors were "casually dressed," that description covers a wide range of attire and is subject to interpretation. Davis has offered no evidence, however, that one or more jurors passed by the prosecution was "similarly dressed" as Ms. Jeter. The fact that some of the jurors were "casually dressed" does not mean that the prosecutor purposefully discriminated against Ms. Jeter.

The prosecutor's final reason for excusing Ms. Jeter was that her responses to questions about her brother's criminal record raised questions about her honesty. Davis faults counsel for failing to argue to the trial court that there was no evidence that Ms. Jeter was being dishonest when she stated that she was not familiar with her brother's criminal record. Furthermore, Davis argues that counsel were deficient for failing to make a record of the fact that the prosecution accepted a white juror, Kelli Connor, whose brother had a pending forgery charge.[28]

During voir dire, the prosecutor noted that Ms. Jeter had responded "yes" on her juror questionnaire when asked if she, any member of her family or a close friend had ever been charged with a crime. The prosecutor attempted to ascertain from Ms. Jeter who that person was, what the charges were and whether they were pending.[29] Ms. Jeter indicated that the person charged was her brother. Ms. Jeter stated that she did not keep up with her brother so she was unsure of the charge but thought it might be a fraud charge, that she was unsure how long ago he was charged but thought it might be in the last two years, and that she was unsure if the charge was pending. As the voir dire progressed, it became apparent that the prosecutors were familiar with Ms. Jeter's brother. Subsequently, during the *Batson* challenge, the prosecutor explained

---

[28]The prosecutor did not question Ms. Connor about the indication on her juror questionnaire that a family member or close friend had been charged with a crime. That Ms. Connor's brother had a pending forgery charge came out during questioning by the defense, after the prosecutor had accepted her as a juror. There is no evidence before the Court that the prosecutor accepted Ms. Connor knowing that her brother had been charged with forgery.

[29]Davis asserts that unlike Ms. Connor, Ms. Jeter acknowledged on her questionnaire that her brother had been charged with a crime. Davis has not provided the Court with a copy of Ms. Jeter's questionnaire. However, it appears from the nature of the questions asked by the prosecutor, that Ms. Jeter did nothing more on her questionnaire than indicate that someone in her family or someone that she knew had been charged with a crime. (JS Tr. 242.) The Court notes that Ms. Connor provided equivalent information on her questionnaire. (Pet'r Ex. 34.)

that the State had questions about Ms. Jeter's honesty because her brother's record was more extensive than Ms. Jeter had acknowledged, and her brother had a pending sex offense charge that Ms. Jeter had not mentioned.

Davis asserts that the record does not support the prosecutor's conclusion that Ms. Jeter was not being honest. However, whether Ms. Jeter's answers ultimately were truthful is not the issue. It is whether the prosecutor purposefully discriminated against her, and in light of her inability to satisfactorily answer questions regarding charges against her brother, Davis cannot show that the prosecutor's explanation was pretextual. Furthermore, the prosecutor did not treat Ms. Jeter differently from other jurors. Before and after excusing Ms. Jeter, the prosecutor questioned five white jurors regarding family members who had been charged with crimes. Unlike Ms. Jeter, four of the five were able to answer the prosecutor's questions regarding the criminal charges. He used peremptory strikes to excuse two of them. The fifth, prospective juror Banks, also was excused by the prosecutor. It is unclear why the prosecutor did not ask Ms. Connor about the indication on her questionnaire that a family member or friend had been charged with a crime. In light of the fact that he had asked six other jurors about the same issue, this may have been merely an oversight on his part.[30]

Because Davis has not shown that the prosecutor purposefully discriminated against juror Wanda Jeter, Davis cannot show that a *Batson* violation occurred. Consequently, Davis cannot show that trial and appellate counsel were ineffective for failing to pursue these issues. *See, e.g.,*

---

[30]It appears that once the prosecutor had seated twelve jurors to his satisfaction and questioning passed to the defense, he did not ask subsequent prospective jurors about criminal charges against family members.

*A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004) ("If there was no underlying constitutional violation, a motion to suppress would have been futile and counsel could not be viewed as ineffective for failing to present such a motion."); *United States v. Carter*, 355 F.3d 920, 924 (6th Cir.2004) (counsel was not ineffective for failing to file motion where there was no reasonable probability that motion would be granted). The MAR court's rejection of Davis's IAC claims was neither contrary to nor an unreasonable application of clearly established federal law. *See* § 2254(d).

CLAIM XVII: *IAC Regarding Reference to Juror's Religion*

Davis claims that counsel were ineffective for failing to argue to the trial court that the prosecutor had unconstitutionally excused juror Wanda Jeter on the basis of her religion. In response to trial counsel's *Batson* objection, the prosecutor offered the race-neutral explanation that Ms. Jeter's cross-shaped earring suggested "a religious consideration that may impact her ability to actually send someone to death . . . ." (JS Tr. 267.) Davis asserts that the North Carolina Constitution prohibits a juror from being excluded from service on account of his or her religion and that trial counsel were ineffective for failing to object to Ms. Jeter's removal on that ground. Davis also claims that appellate counsel were ineffective for failing to raise this issue on appeal.

The MAR court rejected these claims on procedural grounds and on the merits. The State asserts that the IAC claim regarding trial counsel is procedurally defaulted.

*Ineffective Assistance of Trial Counsel*

As noted previously, a federal habeas court will not review a claim that is procedurally

defaulted, absent a showing of cause and prejudice or a fundamental miscarriage of justice to excuse the procedural default. *See Fisher*, 163 F.3d at 844. Generally, a claim will be defaulted if a state court has expressly found that review is barred by an adequate and independent state procedural rule. *See Ashe*, 39 F.3d at 85.

The MAR court held that the claim that trial counsel were ineffective for failing to argue to the trial court that Wanda Jeter's dismissal was made on religious grounds was procedurally barred because it could have been brought on direct appeal but was not. *See* § 15A-1419(a)(3). As noted previously, § 15A-1419(a)(3) generally bars collateral review in the State courts of claims that could have been brought on direct appeal but were not, and the Fourth Circuit has recognized that § 15A-1419(a)(3) generally is an independent and adequate state procedural bar. *See McCarver*, 221 F.3d at 589.

In his Responses to the State's Motion to Dismiss and Motion for Summary Judgment, Davis argues that § 15A-1419(a)(3) is not regularly and consistently applied to IAC claims and cites the same state cases that this Court addressed in its analysis of Claim VIII of the instant Petition. However, for the reasons articulated in the section of this Order denying Claim VIII, those cases do not demonstrate that state courts do not regularly and consistently apply § 15A-1419(a)(3) to IAC claims *that could have been raised on direct appeal* but were not. *See McCarver*, 221 F.3d at 589 (explaining that the relevant inquiry concerns the procedural posture of the defaulted claim).

Davis argues that he could not have brought this claim on direct appeal because it relies on post-conviction affidavits that were not part of the record. The fact that Davis has chosen to

submit affidavits in support of this claim does not mean that they are necessary for a merits analysis. Everything the state appellate court needed to adjudicate this claim was in the record.

Davis has failed to demonstrate cause and prejudice to excuse his failure to raise this IAC claim on direct appeal. *See Sykes*, 433 U.S. at 82. Therefore, this claim is procedurally defaulted. *See id*.

*Ineffective Assistance of Appellate Counsel*

Davis claims that appellate counsel were ineffective for failing to assign as plain error and brief on appeal the prosecutor's dismissal of Ms. Jeter on religious grounds. The MAR court rejected this claim on the merits.

Article I, Section 26 of the North Carolina Constitution provides that "[n]o person shall be excluded from jury service on account of sex, race, color, religion, or national origin." However, as is evident from the prosecutor's statement, Ms. Jeter was excused because the prosecutor questioned her ability to recommend the death penalty not because of her choice of religion. As noted previously, a prosecutor may use a peremptory strike to excuse a juror who has reservations about the death penalty, even if the prosecutor's explanation for the strike does not support a challenge for cause. *See Brown*, 891 F.2d at 497-98. The fact that a prospective juror's religion may provide the basis for his views on the death penalty does not make him any less susceptible to removal. *See State v. (Eugene) Davis*, 386 S.E.2d 418, 427 (N.C. 1989); *State v. Warren*, 499 S.E.2d 431, 442 (N.C. 1998). In this case, Ms. Jeter's prominent display of religious symbolatry caused the prosecutor to doubt whether she would be able to recommend a death sentence if actually called upon to do so.

Because Ms. Jeter's removal did not violate Article I, § 26 of the North Carolina Constitution, appellate counsel were not ineffective for failing to raise this issue on appeal. *See e.g.*, *Butler*, 360 F.3d at 795 ("If there was no underlying constitutional violation, a motion to suppress would have been futile and counsel could not be viewed as ineffective for failing to present such a motion."); *Carter*, 355 F.3d at 924 (counsel was not ineffective for failing to file motion where there was no reasonable probability that motion would be granted). As such, the MAR court's rejection of Davis's ineffective assistance of appellate counsel claim was neither contrary to nor an unreasonable application of clearly established federal law. *See* § 2254(d)(1).

CLAIM XVIII: *"Life Imprisonment Without Parole" v. "Life Imprisonment"*

Davis claims that the trial court committed constitutional error in refusing to instruct the jury that "life imprisonment without parole" was the punishment alternative to death and instructing instead that the alternative was merely "life imprisonment." The North Carolina Supreme Court rejected this claim on the merits.

In *Simmons v. South Carolina*, the Supreme Court held that "[w]here the State puts the defendant's future dangerousness in issue, and the only available alternative is life imprisonment without the possibility of parole, due process entitles the defendant to inform the capital sentencing jury--by either argument or instruction--that he is parole ineligible." 512 U.S. 154, 178, 114 S.Ct. 2187 (1994) (O'Connor, J., concurring).[31] However, a jury need not be informed that a defendant is parole ineligible where the prosecutor limits the issue of future dangerousness

---

[31]The Fourth Circuit treats Justice O'Connor's concurring opinion as controlling because it represents the narrowest grounds upon which the majority agreed. *See Richmond v. Polk*, 375 F.3d 309, 331 (4th Cir. 2004).

to the defendant's potential dangerousness in prison.  *See id*. at 177.  In this case, the prosecution unquestionably put Davis's future dangerousness in prison at issue.  However, it is not as clear that the prosecutor argued or implied that Davis would be a danger if released.

Assuming for the sake of argument that the prosecutor did argue that Davis had a potential for dangerousness if released, the constitutional requirements were met in this case.  As noted above, Davis was entitled to inform the jury "by *either* argument or instruction" that he was not eligible for parole.  *See id*. at 177. (emphasis added)  Davis acknowledges, as he must, that during jury selection and when giving instructions to the jury, the trial judge on some occasions informed the jury that the alternative punishment to death was "life imprisonment without parole."  For example, in the charge to the jury, the judge instructed the jury that, "If you unanimously recommend a sentence of life imprisonment, the court will impose a sentence of life imprisonment without parole."  Furthermore, both trial attorneys throughout their closing arguments informed the jury that the alternative to death was life imprisonment without parole.  As such, the jury was informed by both argument and instruction that Davis was not eligible for parole.  Nothing more is required under *Simmons*.  *See id*.  To hold otherwise would announce a new rule of constitutional criminal procedure on habeas review in violation of *Teague v. Lane*.  489 U.S. 288, 109 S.Ct. 1060 (1989).  The state court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law.  *See* § 2254(d)(1).

CLAIM XIX: *Trial Court's Instructions on Non-statutory Mitigating Circumstances*

Davis claims that during its charge to the jury at sentencing, the trial court committed reversible constitutional error by instructing jurors that they could find that a mitigating

circumstance exists and simultaneously find the mitigating circumstance has no mitigating value. The North Carolina Supreme Court summarily denied the claim. A summary denial constitutes an adjudication on the merits, and the deferential standard of review outlined in § 2254(d)(1) still applies. *See Bell v. Jarvis*, 236 F.3d 149, 158 (4th Cir. 2000) (citing *Wright v. Angelone*, 151 F.3d 151, 156-57 (4th Cir. 1998)). Therefore, the Court will conduct an independent examination of the record and the clearly established Supreme Court law while still applying the deferential standard required by § 2254(d)(1). *See id*. (citation omitted).

During its charge to the sentencing jury, the trial court issued a variation of the following instruction for all of the nonstatutory mitigating circumstances offered by the defense:

> If one or more of you find, by a preponderance of the evidence, that any of the following circumstances exist, and also are deemed to have mitigating value, you would so indicate by having your foreperson write "yes" in the space provided. If none of you find the circumstance to exist, or if none of you deem it to have mitigating value, you would so indicate by having your foreperson write "no" in the space.

(Sent. Tr. 1393-94.) Davis argues that the instruction allowed the jury to refuse to consider mitigating circumstances established by the evidence if it deemed those circumstances to have no mitigating value. Davis argues that if jurors find a mitigating circumstance to exist, they are required to find that the circumstance has mitigating value as a matter of law.

The United States Supreme Court has held that a sentencer "may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." *Buchanan*, 522 U.S. at 276. However, "the state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence." *Id*. (citations omitted). The standard for determining whether jury instructions satisfy

these principles is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190 (1990).

The challenged instruction does not remove from consideration or inform the jury that it can refuse to consider any of the evidence Davis offered in mitigation. Instead, it informs the jurors that after they determine whether the evidence supports the existence of the nonstatutory mitigating circumstances, they need only accept those circumstances that they believe mitigate the severity of the punishment he ought to suffer. Despite Davis's effort to equate "consider" with "accept," "there is simply no constitutional requirement that a sentencing jury must give effect or value to any evidence offered in mitigation." *See Williams v. French*, 146 F.3d 203, 216 n.15 (4th Cir. 1998) (citing *Johnson v. Texas*, 509 U.S. 350, 368, 113 S.Ct. 2658 (1993)); *see also*, *Eddings v. Oklahoma*, 455 U.S. 104, 114-15, 102 S.Ct. 869 (1982) (sentencer can choose what weight to give mitigating evidence, but cannot give it "no weight" by refusing to consider it). In other words, while a sentencer must consider all relevant mitigating evidence, it may conclude that the evidence has little or even no mitigating value.

Furthermore, in addition to the above-challenged instruction, the trial court instructed the jury that, "there will be fifty possible mitigating circumstances . . . , and you should consider each of them before answering Issue 2," (Sent. Tr. 1388), and that,

> it would be your *duty* to consider as a mitigating circumstance any aspect of the defendant's character or record, or any of the circumstances of this murder that the defendant contends is the basis for a sentence less than death, and any other circumstances arising from the evidence which you deem to have mitigating value.

(Sent. Tr. 1388) (emphasis added.) Thus, the challenged instruction did not foreclose the jury's

consideration of any mitigating evidence, and there is no "reasonable likelihood" that Davis's jurors understood the challenged instruction to preclude consideration of relevant mitigating evidence. *See Buchanon*, 522 U.S. at 276. Therefore, the state court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law. *See* § 2254(d)(1).

CLAIM XX: *Trial Court's Submission of both the Armed Robbery and Pecuniary Gain Aggravating Circumstances*

At sentencing, the trial court issued instructions for four statutory aggravating circumstances for the murder of Joyce Miller, including – § 15A-2000(e)(5) (that the murder was committed while the defendant was engaged in the commission of a robbery) and § 15A-2000(e)(6) (that the murder was committed for pecuniary gain). Davis argues that it was error for the trial court to submit both the § 15A-2000(e)(5) and (e)(6) aggravating factors because the evidence necessary to support each of these factors was the same. Therefore, he argues, the aggravating evidence was "double-counted," and the ultimate weighing of the aggravating and mitigating factors by the jury was unfairly tipped in favor of the State. The North Carolina Supreme Court denied the claim on the merits.

As an initial matter, the Court notes that these two circumstances do not rely on identical evidence. They rely on separate evidence, some of which overlaps. Regardless, the U.S. Supreme Court has never held that "aggravating factors could be duplicative so as to render them constitutionally invalid." *Jones v. United States*, 527 US 373, 398, 119 S.Ct. 2090 (1999). Therefore, the North Carolina Supreme Court's rejection of this claim could not have been contrary to any clearly established federal law. *See* § 2254(d)(1). Nor was it an unreasonable

application of clearly established federal law.  *See id.*

The Supreme Court has held that the weighing process in a capital sentencing proceeding "may be impermissibly skewed if the sentencing jury considers an invalid factor."  *Jones*, 527 at 398 (citing *Stringer v. Black*, 503 U.S. 222, 232, 112 S.Ct. 1130 (1992)).  In order to determine whether there was sufficient evidence to prove the existence of an aggravating factor, a court must determine "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements ... beyond a reasonable doubt.'"  *Roach v. Angelone*, 176 F.3d 210, 218 (4th Cir. 1999) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781 (1979)).

With regard to the (e)(5) circumstance, the evidence viewed in the light most favorable to the State shows that Davis shot and bludgeoned Joyce Miller to death.  Within minutes of her death, Davis took a VCR and the keys to Miller's Bravada truck, loaded the VCR in the truck and drove the truck to various locations in Asheville before abandoning it at a gas station.  He threw the VCR in an dumpster and the keys in a trash can.  Thus, there was sufficient evidence to submit aggravating factor § 15A-2000(e)(5), that the murder was committed while the defendant was engaged in a robbery.

With regard to the (e)(6) circumstance, the evidence viewed in the light most favorable to the State shows that Davis shot and bludgeoned Joyce Miller to death.  Within minutes of her death, he took Miller's purse, checks, and credit cards and drove to a grocery store and unsuccessfully attempted to obtain cash by cashing one of Miller's checks.  He subsequently drove to the Asheville mall and used Miller's credit card to purchase clothing, some of which was

identical to clothing Miller had previously returned, believing that it had been bought with money stolen from her. Thus, there was sufficient evidence to submit aggravating factor § 15A-2000(e)(6), that the murder was committed for pecuniary gain.

The foregoing demonstrates that the (e)(5) and (e)(6) circumstances as a whole were not duplicative or invalid. At most, some evidence was relevant to both aggravating factors, but each was supported by sufficient, independent evidence. Furthermore, any risk that the weighing process would be skewed was eliminated by the trial court's instructions to the jury that it could not find both aggravating circumstances using the same evidence. As to the (e)(5) circumstance, the trial court instructed the jury to consider only,

> [t]he taking of the keys to the Bravada automobile, the taking of the Bravada automobile and the VCR which was in the family room . . . in considering this aggravating factor. You may not consider the taking of the credit card, Miss Joyce Miller's purse or the checks of Miss Joyce Miller in order for the State to prove this aggravating factor. Those items may be considered on another aggravating factor which I'll explain to you later, but you many not consider the taking of the credit card, the checks or the purse of Miss Joyce Miller when you consider this aggravating factor.

(Sent. Tr. 1384.) As for the (e)(6) pecuniary gain circumstance, the trial court instructed the jury to consider only,

> the taking of the credit card, checks and the purse of Miss Miller. You may not consider the taking of the VCR, the automobile – that is the Bravada – or the keys to the Bravada automobile when you consider this aggravating factor. Those items may only be considered for purposes of the armed robbery.

(Sent. Tr. 1385.) Additionally, the judge instructed the jury that when weighing the aggravating and mitigating circumstances against each other it "should not merely add up the number of aggravating circumstances and mitigating circumstances . . . [but should] decide from all the

evidence what weight to give each circumstance and then weigh the aggravating circumstances so

valued against the mitigating circumstances so valued . . . ." (Sent. Tr. 1414-15.)

As is evident from the foregoing, a finding of the two aggravating factors was not

dependent upon consideration of the same evidence. Nor was either aggravating circumstance

invalid. Therefore, the North Carolina Supreme Court's rejection of this claim was neither

contrary to nor an unreasonable application of clearly established federal law. *See* § 2254(d)(1).

CLAIM XXI: *Trial Court's Use of "May" Rather Than "Must" for the Instruction Related to Mitigating Evidence and Issues Three and Four*

When instructing the jury regarding the process of weighing aggravating factors against

mitigating circumstances in answering Issue Three, the trial court instructed that,

Issue 3 reads as follows: "Do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances found is, or are, insufficient to outweigh the aggravating circumstance or circumstances found by you?" If you find from the evidence one or more mitigating circumstances, you must weigh the aggravating circumstance or circumstances against the mitigating circumstance or circumstances. *When deciding this issue, each juror may consider any mitigating circumstance or circumstances that the juror determined to exist by a preponderance of the evidence in Issue 2*.

(Sent. Tr. 1414) (emphasis added.) The trail court gave a similar instruction on Issue Four,

instructing that,

Issue 4 reads as follows: "Do you unanimously find beyond a reasonable doubt that the aggravating circumstance or circumstances you found is or are sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance or circumstances found by one or more of you"? In deciding this issue, you are not to consider the aggravating circumstances standing alone. You must consider them in connection with any mitigating circumstance or circumstances found by one or more of you. *When making this comparison, each juror may consider any mitigating circumstance or circumstances that juror determined to exist by a preponderance of the evidence*.

110

(Sent. Tr. 1415) (emphasis added.) Davis claims that the use of the word "may" rather than "must" in the emphasized sentences permitted the jury to ignore relevant mitigating evidence. The North Carolina Supreme Court summarily denied this claim.

As noted in a previous section of this Order, in determining whether a jury instruction violates the Eighth Amendment, a reviewing court must consider "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380. Here there is no reasonable likelihood that the jury misinterpreted the challenged instructions. The instructions made clear not only that the jury was required to weigh the mitigating evidence against the aggravating circumstances, but also that each juror was to weigh those mitigating circumstances found by that particular juror. That the trial court used "may" instead of "must" does not create a reasonable likelihood that the jury misunderstood its task. Therefore, the North Carolina Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law. *See* § 2254(d)(1).

CLAIM XXII: *Use of a Short-Form Indictment*

Davis claims that his conviction is invalid because the "short-form" indictment used in his case did not allege all of the elements of first-degree murder and because it failed to allege any of the aggravating factors that elevate a first-degree murder punishable by life in prison to a capital murder punishable by death. He contends that these omissions render his first-degree murder conviction and death sentence invalid and that the trial court was without jurisdiction to try him for any offense greater than second-degree murder. The North Carolina Supreme Court denied

these claims on the merits.

Davis does not assert that he did not have actual notice of the fact that he was charged with first-degree capital murder.  Nor could he.  The record reveals that on December 13, 1996, Davis's trial attorneys filed a Motion asking that the State be ordered to file a Bill of Particulars listing the aggravating circumstances upon which it intended to rely in seeking the death penalty. (State Ex. 3 (R. on Appeal) 19.)  Thus, at least eight months before his sentencing proceeding, Davis demonstrated knowledge that the State would seek the death penalty for the murders of Joyce and Caroline Miller.

As such, Davis's claim is not that he did not have notice of the charge against him. Instead, his claim is that the indicting document itself was deficient under the United States Constitution.  Because the indictment was deficient, Davis argues, the trial court was without jurisdiction to try him for first-degree murder and/or capital first-degree murder.

Davis claims that his indictment was insufficient to charge the offense of first-degree murder because it did not contain the specific allegations that distinguish first-degree murder (i.e. premeditation and deliberation or the commission of the murder in conjunction with another felony) from second-degree murder.  Davis claims further that the indictment was insufficient to charge him with capital first-degree murder because it did not contain any of the aggravating factors that elevate a first-degree murder, punishable by life in prison, to a capital murder, punishable by death.

As to the first of these claims, relief is foreclosed by the Fourth Circuit's opinion in *Hartman v. Lee*, 283 F.3d 190 (4th Cir. 2002), which was recently reaffirmed in *Stroud v. Polk*,

466 F.3d 291, 295 (4th Cir. 2006), *cert. denied*, 127 S.Ct. 2978 (2007). In *Hartman*, the Fourth

Circuit held that because there is only one offense of "Murder" under North Carolina law, "a

short-form indictment that alleges the elements of common law murder is sufficient to satisfy the

demands" of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment.

283 F.3d at 198-99 (citations omitted). Consistent with N.C. Gen. Stat. § 15-144, Davis's murder

indictment alleges the elements of common law murder. Therefore, it was constitutionally

sufficient under the Sixth Amendment and Due Process Clause of the Fourteenth Amendment.

*See Hartman*, 283 F.3d at 198-99.

Davis's second claim is that the aggravating factors on which the State relied in seeking

the death penalty were "essential elements" of the crime of first-degree capital murder, and as

such, should have been alleged in the indictment. This claim rests upon the assumption that he

has a constitutional right to an indictment alleging all essential elements of the charged crime.[32]

To support his claim, Davis relies upon two recent United States Supreme Court cases,

*Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215 (1999) and *Apprendi v. New Jersey*, 530

U.S. 466, 120 S.Ct. 2348 (2000). *Jones* established the rule that, in federal prosecutions,

> under the Due Process Clause of the Fifth Amendment and the notice and jury trial
> guarantees of the Sixth Amendment, any fact (other than prior conviction) that
> increases the maximum penalty for a crime must be charged in an indictment,
> submitted to a jury, and proven beyond a reasonable doubt.

526 U.S. at 243 n.6. As a result, in federal prosecutions, certain "sentencing factors" may

function as the equivalent of elements of the crime, entitling a defendant to have them charged in

---

[32]The Court will assume *arguendo* that North Carolina's statutory aggravating factors are
"essential elements" of the crime of first-degree capital murder.

an indictment and submitted to a jury using a "beyond a reasonable doubt" standard of proof.  In

*Apprendi*, the Supreme Court held that the Sixth Amendment mandated that in state prosecutions,

"other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the

prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable

doubt."  530 U.S. at 490.

It is undisputed that in the instant case, all essential elements of first-degree murder were

submitted and found by the jury to exist beyond a reasonable doubt as required by *Apprendi*.

However, Davis reads the holding of *Apprendi* further.  According to Davis, *Apprendi*, like *Jones*,

requires that all elements of a crime, including sentencing factors rising to the level of elements of

a crime, be alleged in an indictment.

The Indictment Clause of the Fifth Amendment provides, in pertinent part, that "[n]o

person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment

or indictment of a Grand Jury."  U.S. Const. amend. V.  However, prior to *Apprendi*, the Supreme

Court had not construed the Fourteenth Amendment to include the Fifth Amendment right to

presentment or indictment of a Grand Jury.  *See Alexander v. Louisiana*, 405 U.S. 625, 633, 92

S.Ct. 1221 (1972); *Hurtado v. California*, 110 U.S. 516, 538, 4 S.Ct. 111 (1884).  Nor does

*Apprendi* extend the Fifth Amendment indictment requirement to state court prosecutions.

Indeed, the *Apprendi* Court expressly stated that the issue of whether the Fifth Amendment

indictment requirement applied to the states through the Fourteenth Amendment was not before it.

530 U.S. at 477 n.3 ("Apprendi has not here asserted a constitutional claim based on the omission

of any reference to sentence enhancements . . . in the indictment. . . . [The Fourteenth]

Amendment has not . . . been construed to include the Fifth Amendment right to 'presentment or

indictment of a Grand Jury' . . . . We thus do not address the indictment question separately today.") (internal citations omitted).

The Supreme Court's decision in *Ring v. Arizona* also does not support Davis's assertion that his indictment is constitutionally defective. 536 U.S. 584, 122 S.Ct. 2428 (2002). In *Ring*, the Supreme Court held that the Sixth Amendment requires that a jury, not the judge, determine the presence or absence of aggravating factors when those factors are essential to imposition of the death penalty. 536 US at 609.[33] However, the *Ring* Court was careful to warn against reading its holding too broadly. It noted that Ring's claim was "tightly delineated," alleging only that the *Sixth* Amendment required the jury to find the aggravating factors asserted against him. 536 U.S. at 597 n.4. The Court noted that the issue of whether Ring's indictment was constitutionally defective under the *Fifth* Amendment for failing to include the aggravating factors asserted against him was not before it. *See id*; s*ee also United States v. Higgs*, 353 F.3d 281, 297 (4th Cir. 2003) ("The Supreme Court has not yet addressed the precise issue of whether, and to what extent, the Indictment Clause requires that the intent and aggravating factors be charged in the indictment."). The Court specifically noted that Ring had not raised a claim that his indictment was constitutionally deficient; the Court then cited the following from its *Apprendi* decision: "[The] Fourteenth Amendment has not . . . been construed to include the Fifth Amendment right to presentment or indictment of a Grand Jury." *Id.* (quoting *Apprendi*, 530 U.S. at 477, n.3) (internal quotations omitted). Therefore, *Ring* cannot be read to extend the Fifth Amendment

_____

[33]It is undisputed that in the instant case, the State submitted the aggravating factors upon which it relied to seek the death penalty to the jury and that the jury found those aggravating factors to exist "beyond a reasonable doubt." *See* N.C. Gen. Stat. §15A-2000(c)(1)-(3).

Indictment Clause to the states.  *See United States v. Allen*, 406 F.3d 940, 942 (8th Cir. 2005) ("*Ring* did not address the indictment issue because it involved a state prosecution, and the Fifth Amendment's grand jury requirement has not been construed to apply to the states.  The same is true of . . . *Apprendi* . . . ."), *cert. denied*, 127 S.Ct. 826 (2006).  Because the Fifth Amendment Indictment Clause has not been extended to the states through the Fourteenth Amendment, there is no "clearly established Federal law" requiring that all essential elements, including sentencing factors rising to the level of elements of a crime, be alleged in an indictment in the state courts.  *See* § 2254 (restricting habeas relief to those "in custody in violation of the Constitution . . . of the United States").

The Due Process Clause requires that a defendant be informed of the charges against him.  *See Hartman*, 283 F.3d at 194.  The Sixth Amendment imposes a similar requirement.  *See id*.  North Carolina's short-form indictment was constitutionally sufficient to notify Davis of the charges against him.  *See id*. at 198-99.  Furthermore, Davis has demonstrated that he knew at least eight months prior to the sentencing proceeding that the State would be seeking the death penalty for the murders of Joyce and Caroline.  Therefore, Davis had "reasonable notice" not only that he was charged with first-degree murder but that he also was to be tried capitally.  For the foregoing reasons, the North Carolina Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law.  *See* § 2254(d)(1).

CLAIM XXIII: *North Carolina Death Penalty Scheme Unconstitutional*

Davis claims that the capital sentencing scheme under which he was sentenced was unconstitutional because State prosecutors did not have the discretion to decide whether or not to

seek the death penalty for a defendant convicted of first-degree murder.  Davis claims that a

capital sentencing scheme that does not permit the prosecuting authority to use any discretion in

deciding against whom to seek a death sentence violates the Eighth and Fourteenth Amendments.

The MAR court denied this claim on the merits.

United States Supreme Court death penalty jurisprudence establishes that to pass

constitutional muster a state capital sentencing scheme must "(1) rationally narrow the class of

death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing

determination based on a death-eligible defendant's record, personal characteristics, and the

circumstances of his crime."  *See Kansas v. Marsh*, 126 S.Ct. 2516, 2524-25 (2006) (citations

omitted).  This claim concerns only the requirement that the scheme rationally narrow the class of

death-eligible defendants.

To be eligible for the death penalty, a defendant "must be convicted of a crime for which

the death penalty is a proportionate punishment."  *Tuilaepa v. California*, 512 U.S. 967, 971, 114

S.Ct. 2630 (1994) (citation omitted).  In the case of homicides, the trier of fact "must convict the

defendant of murder and find one 'aggravating circumstance' . . . at either the guilt or penalty

phase." *Id*. at 972 (citations omitted).  The aggravating circumstance must meet two requirements:

"First, the circumstance may not apply to every defendant convicted of a murder; it must apply

only to a subclass of defendants convicted of murder. . . . Second, the aggravating circumstance

may not be unconstitutionally vague."  *Id*. (citations omitted).

Under the capital sentencing scheme in place when Davis was sentenced, the state's

district attorneys had no discretion to decide whether to try a defendant capitally or noncapitally

117

for first-degree murder. *See State v. Rorie*, 500 S.E.2d 77, 80 (N.C. 1998) (citing § 15A-2000 (1997)). Instead, whether a defendant was tried capitally was dictated by whether there was evidence of the existence of a statutorily-defined aggravating circumstance. *See id.* Thus, a prosecutor could not seek the death penalty for all first-degree murders but was required to pursue a capital sentence when there was evidence of an aggravating circumstance. *See id.* If there was evidence of at least one aggravating factor, a separate penalty phase was held. *See* § 15A-2000. During that penalty phase, the prosecutor was required to present sufficient evidence to convince the trial judge to instruct the jury on at least one statutorily enumerated aggravating factor.[34] *See id.* If the judge determined that there was sufficient evidence to instruct the jury on the existence of an aggravating factor, the jury was then required to find the existence of at least one aggravating factor beyond a reasonable doubt in order for the defendant to be eligible for the death penalty. *See id.*

The U.S. Supreme Court has never held that in order for a state capital sentencing scheme to "rationally narrow the class of death-eligible defendants," the state's prosecutors must have the discretion to decide whether to seek the death penalty on a case-by-case basis. Therefore, the MAR court's rejection of this claim was not contrary to clearly established federal law. *See* § 2254(d)(1). Furthermore, post-*Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978 (1976)[35], North Carolina's capital sentencing scheme has been reviewed innumerable times by the federal courts and has not been struck down on the ground that it fails to rationally narrow the class of

_____

[34]The Court notes that in this case the State unsuccessfully sought submission of the "especially, heinous, atrocious and cruel" aggravating circumstance for the murder of Caroline.

[35]In *Woodson*, the U.S. Supreme Court struck down a North Carolina statute mandating a sentence of death for a first-degree murder conviction. 428 U.S. 280, 96 S.Ct. 2978 (1976).

death-eligible defendants.  As such, the MAR court's rejection of this claim was not an

unreasonable application of clearly established federal law.  *See* § 2254(d)(1).  Finally, as the

State argues, to hold that North Carolina's capital sentencing scheme was unconstitutional

because the prosecutor did not have the discretion to decline to seek the death penalty in Davis's

case would announce a new rule of constitutional criminal procedure on habeas review in

violation of *Teague v. Lane.*  489 U.S. 288, 109 S.Ct. 1060 (1989).

    For the foregoing reasons, its is HEREBY ORDERED THAT:

1.  Petitioner's Petition for Writ of Habeas Corpus [Doc. 2] is DENIED;

2. Respondent's Motion for Summary Judgment is GRANTED [Doc. 29];

3. Petitioner's Cross-Motion for Summary Judgment [Doc. 32] is DENIED, and

4. Respondent's Motion to Dismiss [Doc. 14] is DENIED as moot.

    Signed: September 28, 2007

Frank D. Whitney
United States District Judge